UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
United States of America,

        -vs-

                                              15 Cr. 095 (WFK)

Abdurasul Hasanovich Juraboev,

        Defendant.
------------------------------------------------------------x

## Abdurasul Hasanovich Juraboev's Sentencing Memorandum

                                              Federal Defenders of New York
                                              Attorneys for Abdurasul Hasanovich Juraboev
                                              One Pierrepoint Plaza, 16th Floor
                                              Brooklyn, New York 11201
                                              Tel.: (718) 407-7413
                                              Michael Weil/Sabrina Shroff
                                                *Of Counsel*

October 13, 2017

Honorable William F. Kuntz II
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

  Re: *United States v. Abdurasul Hasanovich Juraboev*, 15 Cr. 095 (WFK)

Dear Judge Kuntz:

  We respectfully submit this sentencing memorandum on behalf of our client, Abdurasul Hasanovich Juraboev. For the reasons set forth below, the Court should sentence Mr. Juraboev to a non-guidelines sentence of five or less years in prison (to be followed by additional time in ICE custody and deportation back to Uzbekistan).

  Mr. Juraboev has pled guilty, in a timely manner and more than a year prior to his original co-defendants, to one count of Conspiracy to Provide Material Support to a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B(a)(1). Specifically, he planned to travel to Syria to see about joining the Islamic State ("ISIL"), a designated Foreign Terrorist Organization ("FTO"). *See* Presentence Investigation Report ("PSR") at ¶ 23. There is no minimizing his conduct; Juraboev surely intended to travel to Syria to try to join ISIL. This is why he pled guilty to the charge against him.

  Equally sure, however, is that Juraboev was ready to reject ISIL if he thought their conduct contravened the word and teachings of Prophet Mohammed and Allah, and if they failed to properly "care for people" – Muslims, Christians and Jews. 8/15/14 FBI Interview at 3. Moreover, as the government concedes, his material support was entirely prospective; Juraboev "had no semblance of any leadership, managerial or organizational involvement" in ISIL. PSR ¶ 23. He had not yet joined ISIL, and may not have done so in the end.

  When the Court considers Mr. Juraboev's history and character, and the nature and circumstances of his offense, the Court will find an unsophisticated, gullible, and lonely young man with no prior criminal history separated for the first time from his family and his culture. Seeking some comfort in his religion, and educating himself for the first time about Islam, Juraboev met some wrong people and reached some wrong conclusions about Islam and ISIL. Yet, he remains, at heart, the same kind person he was growing up in Uzbekistan. When all the sentencing factors are applied, it becomes evident that a single digit sentence of five years or less in prison is a severe enough sentence for Mr. Juraboev, and fully accords with sentences imposed for similar cases.

## BACKGROUND

**Abdurasul Hasanovich Juraboev**

Abdurasul Hasanovich Juraboev is 27 years old, and has no prior criminal history. PSR ¶¶ 40, 45. Born and raised on his family's farm in Jizzakh, Uzbekistan, Abdurasul was the youngest of six children. *Id.* ¶ 47. His parents, Hassan Ochilov and Gulsara Ochilova, did the best they could to provide for the family. Still, the family was poor and struggled, often unsuccessfully, to pay for electricity, food, and other necessities. *Id.* ¶¶ 45-47. After finishing high school, Adurasul worked as a farmer with his parents. *Id.* ¶ 64.

In 2011, when Abdurasul was 21 years old, his life changed dramatically. He won the United States' green card "lottery", which gave him legal permanent resident status in the United States. PSR ¶ 48. Leaving his home and his family for the first time, Abdurasul moved to Brooklyn, New York. *Id.* For the next four years, Abdurasul faced the challenges, and followed the path, laid out by many prior immigrants, as they tried to adjust to a new country. He found places to live, tried to learn some English, and worked hard for long hours at a series of entry-level jobs, stocking food at markets, cutting salad and making deliveries at a fast food place, and working on construction sites as a day or general laborer. *Id.* ¶¶ 57-63. Most of the money he managed to make he sent back to his family in Jizzakh, to help take care of them. 8/15/14 FBI Interview at 2.

A letter from Abdurasul's older brother discusses Abdurasul's many positive qualities, how much his parents and siblings miss him, and their wish that Adurasul return to his family in Uzbekistan:

> He [Abdurasul] always put the family interests ahead of his own interest. He was sincere with his friends, but his nature was different (exceptional) from their bad habits such as drinking, smoking and lying. If someone was asking for help, he would never say no. He wants to help everyone as much as he could.
>
> * * *
>
> It is over 6 years…we are missing him too much. My parents' soul/heart is broken. The only thing that kept them in this world now is a wish to see our little brother again. My mother is 57 years old and father – 59 years old now.

Letter from family (attached hereto as **Exhibit A**).

Leaving home was equally hard for Abdurasul. He knew no one in the United States; he had no family or friends, not even an acquaintance here. Yet, no matter how lonely and adrift he felt, he knew that he had to stay and "care for his family by working and sending money back." 8/15/14 FBI Interview at 2. Seeking a community, Abdurasul joined a mosque and began studying the Koran. As he studied, he became more and more religious, a process that intensified when Abdurasul fell ill in 2012, and believed that he had healed himself through prayer. *Id.*

**The instant offense**

In the fall of 2014, Juraboev, along with co-defendant Akhror Saidakhmetov, decided to travel to Syria with the intention of joining ISIL. To this end, encouraged in part by a confidential informant in the government's employ, Juraboev purchased a ticket to fly to Turkey in March 2015. PSR ¶¶ 13, 23. Instead, on February 25, 2015, Mr. Juraboev was arrested in his apartment in Brooklyn, and has been incarcerated ever since. *Id.* at p. 1. On August 14, 2015, he timely pled guilty to one count of conspiracy to provide material support to a foreign terrorist organization – namely, trying to provide himself to ISIL in Syria. *Id.* ¶ 1.

**This case is not about Mr. Juraboev's religious views or his comments about President Obama**

In August 2014, the FBI twice interviewed Mr. Juraboev. His responses were remarkable for their absolute guilelessness. When the FBI presented him with hypothetical questions as to whether he would harm President Obama if directed to do so by ISIL, he responded with hypothetical answers, indicating he would, *provided* the order had a basis in the Koran. Complaint ¶ 8. He also noted that, as a practical matter, he would be "too busy at work" to try to see President Obama if he were to visit New York. 8/18/14 FBI Interview at 2.

Mr. Juraboev's musings to the FBI were purely academic in nature, a point underscored by Mr. Juraboev's conversations with his associates – conversations he did not know were being recorded. At no point in those conversations did Mr. Juraboev advocate plans to engage in violence inside the United States. To the contrary, as detailed in the Complaint, when one of his co-conspirators discussed joining the U.S. military and attacking American soldiers, Mr. Juraboev disapproved of any such plans, stating that leaving for Syria would be the better course. Complaint ¶ 23. As Juraboev later explained, any violent act in the United States would be improper, as "it is only appropriate to wage jihad through fighting on Muslim lands." 8/18/14 FBI Interview at 2.

Except for narrow circumstances such as shouting "fire" in a crowded theatre, mere talking should never result in prison time. We, as a country, do not jail people for having thoughts – bad thoughts, vile thoughts, racist thoughts, or prurient thoughts. Accordingly, Mr. Juraboev should not be sentenced based on hypothetical, uncharged situations posed by the FBI during questioning, or for bad thoughts espoused on-line. Simply put, thoughts are not crimes and we do not punish people for having them.

Nor under our criminal justice system do we convict or punish people based on fear of what they might do in the future. Our society does not punish a person based on "the prospect he would commit…crimes when he got the opportunity." *United States v. Allen*, 488 F.3d 1244, 1260 (10th Cir. 2007). While it may be tempting to depart from that principle when the contemplated deed is horrific, "courts must refrain from doing so" even when the government is asking them for precisely such a thing. *Id.* at 1260-61. Naked speculation that Mr. Juraboev may have committed terroristic crimes, whether in Syria or the United States, at some future date is reminiscent of a dystopian world in which "would-be criminals are apprehended and punished for crimes they are predicted to commit, before they have a chance to actually commit them." *Id.* at 1260 & n.7. The Constitution simply doesn't allow us to punish someone for a crime they haven't committed, just because the government contends he/she may one day do so.

In the end, Mr. Juraboev should be sentenced for buying a plane ticket to Turkey, with the intention of crossing over to Syria to join ISIL – and for that alone. In this regard, it must be emphasized that it remains an open question whether Mr. Juraboev ultimately would have joined ISIL once he reached Syria.

Mr. Juraboev's various statements, to the FBI and to others, show someone new to the faith still grappling with what it meant to practice Islam properly. Compounding his confusion was his efforts to understand the sectarian civil war in Syria. Among those Abdurasul listened to for guidance was Shaykh Abdulloh Buhoriy. 8/15/14 FBI Interview at 2. Buhoriy, the chief imam of a large Uzbek mosque and madrasah based in Istanbul, rose to prominence on social media from 2012–2014. While Buhoriy declined to publicly support any particular party or militant opposition organization operating in Syria, he did make it clear that he believed that all Uzbeks were obligated to support the anti-Assad effort because the Syrian civil war constituted an attack on Sunni Muslims by an Alawite and Shiite Muslim alliance (the Assad government, led by minority Alawites, and supported by Iran). *See* Noah Tucker, *Central Asia Involvement in the Conflict in Syria and Iraq: Drivers and Responses*, available at *htttps://www.usaid.gov/sites/default/files/documents/1866/ CVE_CentralAsiansSyriaIraq.pdf*, at p. 7.[1]

Frustrated in the United States, and hoping to help defend his fellow Sunni Muslims, Juraboev decided to travel to Syria and join the civil war. This does not mean, however, that once in Syria Juraboev ultimately would have joined ISIL. Indeed, Juraboev's sometimes contradictory responses to the leading and hypothetical questions posed by the FBI during his August 2014 interviews show that he had not yet made up his mind about ISIL, or his own future path.

- Juraboev stressed to the FBI "that fighting is not the only way of doing jihad," and "described helping one's family and 'taking knowledge' as other ways of doing jihad." 8/18/14 FBI Interview at 2.

- Juraboev stressed that jihad can also involve an interior struggle against anger or passion. Thus, Juraboev wrote: "Presently, I too wage Jihad against my passion." Verbatim Translation of 8/18/14 Juraboev Written Statement at 1.

- Juraboev rejected the suggestion of co-defendant Saidakhmetov that one could do jihad through "fighting here in the U.S." Juraboev explained that "it is only appropriate to wage jihad through fighting on Muslim lands." 8/18/14 FBI Interview at 2.

- Even in Muslim lands, "[k]illing is 'not easy" in Islam." *Id.* at 3. "[A]n order to kill under Islam can only be issued for specific individuals and not for large groups of people." *Id.*; *accord id. at 2* ("Juraboev stated that killing is not easy in Islam, and the decision to kill requires a lot of thought").

---

[1] In December 2014, Buhoriy was assassinated in Istanbul, apparently by Russian and/or Uzbeki clandestine services. Noah Tucker, *Central Asia Involvement in the Conflict in Syria and Iraq: Drivers and Responses*, available at *https://www.usaid.gov/sites/default/files/documents/1866/ CVE_CentralAsiansSyriaIraq.pdf*, at p. 7.

- Any order given to him by ISIL "would have to be correct under Islam. Juraboev would personally check such an order to ensure its legitimacy under Islam." 8/18/14 FBI Interview at 2. In this regard, Mr. Juraboev emphasized that under true Islam, one could not kill indiscriminately or out of anger. Rather, Islam mandates that one must care for Muslims who follow Allah, and also requires that "Christians and Jews are cared for." *Id.* at 3; *see also* 8/15/14 FBI Interview at 3 (same).

- Juraboev also desired to return to Uzbekistan so he could "share his faith with his family." 8/18/14 FBI Interview at 3; 8/15/14 FBI Interview at 3 (same).

**Juraboev's post-arrest statements**

In his initial August 2014 interviews with the FBI Mr. Juraboev answered hypothetical questions about killing civilians in the United States by saying he could do so, if directed by someone he deemed knowledgeable about Islam *and* he thought the order was consistent with the Koran. By the time of his 2015 arrest, his thinking had evolved to the point where he realized that indiscriminate killing was clearly wrong, regardless of what someone else told him. In a lengthy post-arrest statement, which was videotaped, Mr. Juraboev said he believed violent action against civilians in the United States was always wrong. He said he believed setting off a bomb somewhere in Brooklyn -- even if directed to do so by someone knowledgeable about Islam -- would be wrong, both because indiscriminate killing is wrong -- "everyone's verdict is only for them" -- and because violent jihad is only appropriate in the Islamic State. (MVI0061 at 7:45 to 10:40.) He indicated his thinking had changed since he was previously asked such hypothetical questions by the FBI. (*Id.*) He described his co-defendant Akhor Saidakhmetov as being more extreme than him -- "he was more one-sided in his views ... his thoughts were always with jihad" and acknowledged having counseled Akhor *against* committing violent jihad in the United States. (MVI61 28:30 to 29:45) Asked his opinion about the then-recent attacks in Paris at the Charlie Hebdo newspaper, his immediate response was that "It was a wrongful act." (MVI0061 at 15:40).

Mr. Juraboev's statements cannot be dismissed as self-serving efforts to minimize his culpability. He knew full well his plans to travel to Syria had landed him in FBI custody, and yet never wavered in expressing his determination to get there. Moreover, his statements rejecting violent action here mirror those he made to Saidakhmetov when he did not know he was being recorded. Complaint ¶ 23.

**Mr. Juraboev's post-arrest conduct
and eventual deportation to Uzbekistan**

Despite the many lockdowns at the MDC for gang fights and other violence, Mr. Juraboev has incurred no disciplinary infractions during the over two years he has been in prison. PSR ¶ 49. At the MDC, Mr. Juraboev has made good use of his time. He has worked at learning English and improving his vocabulary. His conversational and written English have improved tremendously, and he can now carry on a social conversation with counsel without an interpreter.

He continues to study and tries each day to improve himself. Indeed, as he details in a letter to the Court attached hereto as **Exhibit B**, he has even read a book about the dangers of Extremism.

The government has lodged an ICE detainer against Mr. Juraboev. PSR at p. 1. He "will be removed from the United States after serving his term of incarceration for the instant offense" and deported back to Uzbekistan. *Id.* ¶ 48. The current wait for deportation is about 5 months.

## DISCUSSION

### The Court Should Sentence Mr. Juraboev to a Single Digit Sentence of Five Years or Less In Prison

**I.     The Applicable Sentencing Law**

In arriving at a just sentence, this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). That provision directs sentencing courts to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)," namely, "proportionality, deterrence, incapacitation, and rehabilitation." *Id.*; *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) (same). In determining the lowest sentence sufficient to achieve these sentencing objectives, this Court is directed to consider (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need to promote respect for the law, provide just punishment, and protect the public from further crimes of the defendant; (4) the need for general and specific deterrence; (5) the need to provide the defendant with necessary treatment; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to victims. 18 U.S.C. 3553(a)(1)(3)-(6).

While the Court begins its analysis with the advisory guidelines range, that range is but one factor in a multi-factor analysis and is entitled to no special weight. "[T]he Sentencing Guidelines are just that, guidelines, and ... 'they truly are advisory.'" *Douglas*, 713 F.3d at 700 (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)). The Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007). Rather, it "must make an individualized assessment based on the facts presented." *Id.* As detailed herein, those facts support the requested non-guidelines sentence of five years or less in prison, to be followed by additional time in ICE custody and deportation to Uzbekistan.

**II.     The Sentencing Factors and Goals Support a Single Digit Sentence**

**A. Mr. Juraboev's history and characteristics strongly support a single digit sentence of five years or less in prison**

When he committed his crime, Abdurasul was only 24 years old. Like many persons in their early twenties, he tended toward absolutism, a youthful characteristic exacerbated by his loneliness and new-found religious zeal. His over two years in prison have tempered these aspects of his character, as shown by the fact that he has incurred no disciplinary infractions while in the custody of the Bureau of Prisons. He now understands all too well that there are better, non-violent ways to serve and honor his God and support his fellow Muslims. Five years is sufficient

punishment, yet it is short enough that a wiser 34-year-old Abdurasul will be able to return to Uzbekistan, help take care of his frail parents and other family members, and begin a new chapter in his life.

Moreover, in imposing sentence, the Court should consider that Mr. Juraboev is half-the-world away from his family and friends. Once he is designated to a facility, Mr. Juraboev will have no one to visit him. As it is now, the only visits Mr. Juraboev gets are those from his lawyers. Should the Court impose the requested sentence of 5 years, Mr. Juraboev will spend the next two-and-a-half years in the company of just his fellow inmates. Mr. Juraboev will have no visits from friends or family. Mr. Juraboev will have no one able to put money in his commissary account. Mr. Juraboev will have to spend his years in jail without any support. This will make the time Abdurasul spends in prison far more difficult, severe, and punishing for him than for those who have family and friends in the United States.

### B. The offense characteristics strongly support a single digit sentence of five years or less in prison

As we acknowledged at the outset of this submission, providing material support to an FTO is a serious crime. No one – including Mr. Juraboev – would say otherwise. But there is not the slightest allegation that Juraboev was actually part of ISIL, or part of any ISIL plot or operation. As the government expressly acknowledges, Juraboev "had no semblance of any leadership, managerial or organizational involvement" in ISIL. PSR ¶ 23.

Material support cases cover a wide range of conduct. Some involve preparation for combat; others involve the recruitment and funding of others for travel. Mr. Juraboev's conduct is at the lowest end of the spectrum. The sentence in *United States v. Natsheh*, 16 Cr. 166 (RS) (N.D. Ca.), is instructive. There, Judge Seeborg imposed a sentence of 60 months in custody because

> there wasn't any training. There weren't any weapons involved. There wasn't any providing of financial assistance. There doesn't appear to have been any direct effort to recruit others. The conduct really was restricted to starting the process of joining up with a terrorist organization.

Transcript of Sentencing Proceeding, *United States v. Natsheh*, at 30-31 (Attached hereto as **Exhibit C**). The facts in *Natsheh* are remarkably similar to the facts here, and we ask the Court to consider imposing a comparable sentence. Up to five years behind bars is sufficient punishment for an aborted effort to travel to Syria by a misguided and misled young person who had led an otherwise law-abiding life. Mr. Juraboev undertook no violence and had no concrete plans for any actual violent acts. No death or harm resulted from his purchase of a plane ticket, and he was halted before he even left the United States. Moreover, he undertook no military or similar training before he left – he "has never fired a gun in Uzbekistan or in the United States" (8/15/14 FBI Interview at 2) – and he had no plans, and made no preparations, to take any weapons, or even supplies, with him to Syria.

### C. The sentencing goals of specific deterrence and incapacitation strongly support a single digit sentence of five years or less in prison

Mr. Juraboev sincerely regrets his actions. While he remains a practicing Muslim, he has re-thought and rejected the beliefs that led him to try to join ISIL. He knows now that he can be a good Muslim without joining or supporting ISIL or any similar organization, and will never attempt to join or provide material support to one again. His only desire now is to return to his humble home and family in Uzbekistan and live there quietly. See **Exhibit B**. Quite simply, he is no threat to break the law again.

### D. The sentencing goal of general deterrence is met by a single digit sentence of five years or less in prison

The question of the role general deterrence should play in sentencing is a complicated one, to say the least. Deterrence is, after all, "a phenomenon that is notoriously difficult (and perhaps impossible) to measure." *United States v. Brady*, No. 02 CR 1043(JG), 2004 WL 86414, at *9 (E.D.N.Y. Jan 20, 2004). Evidence-based studies support the conclusion that it is the certainty of *apprehension* rather than the severity of the ensuing legal *punishment* that more effectively deters crime. *See, e.g.*, Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 202 (2013) (reviewing empirical deterrence studies and their attendant literature).

In *United States v. Caspersen*, 16 Cr. 414 (JSR) (S.D.N.Y.), Judge Jed Rakoff sentenced defendant Andrew Caspersen to four years in prison for perpetrating a $38.5 million fraud. Regarding general deterrence, Judge Rakoff said:

> [g]eneral deterrence, of course, when crime is [as] large [as this one,] calls for substantial time. But I'm not sure there is any magic in any given number of years. And in fact, again to talk about the studies, which are not scientific at all, but nevertheless the studies suggest that there is no way to measure how much more general deterrence, if any, is achieved by adding five years or 10 years to a prison term. A meaningful prison term is necessary to have general deterrence, but how much prison term is largely a matter of guesswork, or of taking account of the other factors, other than general deterrence into [sentence] consideration.

Transcript of Sentencing Proceeding, *United States v. Caspersen*, *supra*, at 59-61.

In a case with facts close to the present one, Shannon Maureen Conley was sentenced to four years in prison for conspiracy to provide material support to a designated FTO. The FBI placed Conley under surveillance after she stated in an FBI interview that she supported jihad. She was told, by those she followed, to obtain training in firearms and military tactics before she traveled to Syria, and was then arrested as she attempted to travel to Syria via Turkey. *See* United States v. Conley, 14 Cr. 163 (D. Colo.) There is no reason why Mr. Juraboev's sentence should be materially different that Ms. Conley's sentence. For any person considering joining ISIL, Mr.

Juraboev is sure to be a cautionary and persuasive warning. One extremist website posting was enough to place Juraboev under FBI scrutiny. Thereafter, the government marshaled all its resources, including the use of intercepts, surveillance, and a confidential informant, to investigate and ultimately arrest Juraboev and four others. Those apprehension efforts, together with a multi-year sentence, followed by additional months in ICE custody and deportation to Uzbekistan, is certainly enough to deter anyone thinking about materially supporting an FTO. Anything more would be greater than necessary to achieve the sentencing goal of general deterrence.

### E. A single digit sentence of five years or less in prison will avoid unwarranted sentencing disparities.

A single digit sentence of five years or less in prison accords with sentences handed out in similar cases in New York's judicial districts. *See, e.g., United States v. Mohammed Al-Moayad*, 03 Cr. 1322 (80 months for materially supporting Al Qaeda and Hamas); *United States v. Idriss Abdelrahman*, 09 Cr. 1244 (S.D.N.Y.) (46 months in prison for materially supporting Al Qaeda and FARC); *United States v. Sahim Alwan*, 02 Cr. 214 (114 months in prison for materially supporting Al Qaeda); *United States v. Mahdi Hashi*, 12 Cr. 661 (E.D.N.Y.) (108 months in prison for materially supporting Al-Shabaab); *United States v. Shafal Mosed*, 02 Cr. 214 (W.D.N.Y.) (96 months in prison for materially supporting Al Qaeda); *United States v. Harouna Toure*, 09 Cr. 1244 (S.D.N.Y.) (63 months for materially supporting Al Qaeda and FARC); *United States v. Mohammed Zayed*, 03 Cr. 1322 (E.D.N.Y.) (80 months for materially supporting Al Qaeda and Hamas).

Considering disparities is difficult as each case is different, and material support cases differ more than most because of the wide range of conduct prohibited by the statute. Though surely individually distinguishable, the cases above demonstrate at a minimum that a sentence of 108 months would be well within the broad range of permissible decisions in a case such as this. *See United States v. Thavaraja*, 740 F.3d 243, 263 (2d Cir. 2014) (dismissing government appeal of the substantive reasonableness of nine-year sentence for defendant convicted of conspiracy to provide material support to an FTO and conspiracy to bribe public officials, instead finding the sentence "reflects thoughtful and principled consideration by a conscientious district judge of all the factors relevant to an individualized determination of a fair and just sentence.") Indeed, the sentence we seek is similar to those handed down to Mr. Natsheh and Ms. Conley, whose conduct was most similar to that of Mr. Juraboev. The Court need not sentence Mr. Juraboev to anything more than five years to avoid unwarranted sentence disparities.

## Conclusion

For each and every one of the reasons set forth herein, a custodial sentence of five years or less is sufficient punishment for this defendant, and is in line with other material support sentences involving similar conduct. Accordingly, the Court should sentence Mr. Juraboev to a non-guidelines sentence of five years or less in jail.

Respectfully submitted,

/s/
Sabrina Shroff /Michael Weil
Assistant Federal Defenders

SPS/hls

cc:  All Attorneys of Record (by ECF)