UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,

PLAINTIFF, CASE NO. CR-16-00166-RS

VS. SAN FRANCISCO, CALIFORNIA

ISLAM SAID NATSHEH, DECEMBER 13, 2016

DEFENDANT. PAGES 1 - 39

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF: OFFICE OF THE UNITED STATES ATTORNEY
BY: ELISE BECKER
450 GOLDEN GATE AVENUE, 11TH FLOOR
SAN FRANCISCO, CALIFORNIA 94102

FOR THE DEFENDANT: OFFICE OF THE FEDERAL PUBLIC DEFENDER
BY: CANDIS LEA MITCHELL
459 GOLDEN GATE AVENUE, ROOM 19-6884
SAN FRANCISCO, CALIFORNIA 94102

U.S. PROBATION: JILL SPITALIERI

OFFICIAL COURT REPORTER: IRENE L. RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT PRODUCED WITH COMPUTER.

SAN JOSE, CALIFORNIA DECEMBER 13, 2016

P R O C E E D I N G S

(COURT CONVENED AT 2:55 P.M.8)

02:55PM THE CLERK: CALLING CASE CR-16-166, UNITED STATES VERSUS ISLAM SAID NATSHEH.

02:55PM MS. BECKER: ELISE BECKER FOR THE GOVERNMENT. GOOD AFTERNOON, YOUR HONOR.

02:55PM THE COURT: GOOD AFTERNOON, MS. BECKER.

02:55PM MS. MITCHELL: GOOD AFTERNOON, YOUR HONOR. CANDICE MITCHELL FROM THE FEDERAL PUBLIC DEFENDER'S OFFICE ON BEHALF OF MR. NATSHEH WHO IS PRESENT BEFORE THE COURT.

02:56PM THE COURT: GOOD AFTERNOON. THIS IS THE TIME AND DATE SET FOR SENTENCING IN THIS MATTER.

02:56PM HAVE COUNSEL HAD THE OPPORTUNITY TO REVIEW THE PRESENTENCE REPORT?

02:56PM MS. BECKER: YES, YOUR HONOR.

02:56PM THE COURT: AND, MS. MITCHELL, HAVE YOU HAD THE OPPORTUNITY TO DISCUSS IT WITH MR. NATSHEH?

02:56PM MS. MITCHELL: YES, YOUR HONOR.

02:56PM THE COURT: THERE WAS ONE OBJECTION THAT WAS NOTED IN THE PRESENTENCE REPORT TO CERTAIN LANGUAGE THAT HAD BEEN ASCRIBED TO THE DEFENDANT. THAT APPEARED TO BE THE ONLY ISSUE.

02:56PM IS THAT THE ONLY ISSUE THAT IS REQUIRING RESOLUTION?

02:56PM MS. MITCHELL: YES, YOUR HONOR.

02:56PM THE COURT: OKAY. I DID REVIEW THE OBJECTION, AND I

REVIEWED THE PROBATION OFFICER'S RESPONSE.

ANYTHING FURTHER YOU WANT TO SAY?

MS. MITCHELL: NO, YOUR HONOR.

THE COURT: ALL RIGHT. I HAVE REVIEWED IT. I THINK THOSE STATEMENTS ARE SET FORTH BY WAY OF BACKGROUND INFORMATION, AND SO I WILL OVERRULE THE OBJECTION.

I -- JUST SO IT'S CLEAR, I HAVE REVIEWED THE PRESENTENCE REPORT, AND I REVIEWED THE OPEN PLEA APPLICATION, AND I'VE REVIEWED THE GOVERNMENT'S SENTENCING MEMORANDUM THAT INCLUDES SOME MATERIAL FROM THE CASE IN THE DISTRICT OF MINNESOTA WHICH HAS SOME COMPARABLES AND THEN ALSO THE GOVERNMENT'S REPLY BRIEF, I REVIEWED THE DEFENDANT'S MEMORANDUM, INCLUDING LETTERS FROM MR. NATSHEH'S YOUNGER SISTER, FATHER, FRIENDS, COWORKER, CLERICAL INDIVIDUAL, AND AUNT AND UNCLE.

OUR STARTING POINT IS ALWAYS THE ADVISORY SENTENCING GUIDELINES WHICH AS A RESULT OF THE TERRORIST ENHANCEMENT RESULTS IN A GUIDELINE CALCULATION AS I THINK IS CORRECTLY SET FORTH IN THE PRESENTENCE REPORT OF A TOTAL OFFENSE LEVEL OF 37 AND A CRIMINAL HISTORY CATEGORY OF 6, AND THAT'S THE RESULT OF THE ENHANCEMENT BECAUSE OTHERWISE THERE'S NO CRIMINAL HISTORY.

THAT WOULD YIELD AN ADVISORY SENTENCING GUIDELINE RANGE OF 360 MONTHS TO LIFE. THE STATUTORY MAXIMUM UNDER THE STATUTE, AS I UNDERSTAND IT, IS ON THE ONE COUNT INFORMATION THAT IS INVOLVED HERE IS A 20-YEAR MAXIMUM. SO THAT IS THE MAXIMUM PENALTY THAT COULD BE IMPOSED IN THIS INSTANCE.

THE PROBATION DEPARTMENT IN THEIR REPORT RECOMMENDS THE STATUTORY MAXIMUM. THE GOVERNMENT RECOMMENDS A DOWNWARD VARIANCE TO 15 YEARS WITH A 15-YEAR TERM OF SUPERVISED RELEASE, AND THE DEFENSE IS ARGUING FOR A SENTENCE OF 48 MONTHS INVOKING A CASE THAT THEY POINT ME TO IS A COMPARABLE.

MS. BECKER?

MS. BECKER: YOUR HONOR, THE GOVERNMENT HAS MADE A RECOMMENDATION THAT IS SLIGHTLY BELOW THE STATUTORY MAXIMUM FOR SEVERAL REASONS.

OBVIOUSLY, AS THE COURT HAS INDICATED, THE STARTING POINT IS ALMOST A NONSTARTER BECAUSE THE GUIDELINES ARE ABOVE THE STATUTORY MAXIMUM, BUT IF WE WERE TO LOOK AT THE CASE AND AS WE MUST AS A 20-YEAR CEILING TO IT, THE QUESTION IS WHERE DOES THE CASE FALL WITHIN THAT RANGE?

THE GOVERNMENT HAS PROVIDED SOME BACKGROUND INFORMATION TO THE COURT RELATING TO CASES ACROSS THE NATION. OBVIOUSLY THE FACTS ARE ALWAYS A LITTLE BIT DIFFERENT. SOME INVOLVE MORE PREPARATION FOR COMBAT OR FOR TRAVEL OR FOR FUNDING.

THE COURT: WELL, ISN'T IT FAIR TO SAY THAT THIS ONE INVOLVES THE LOWEST END OF ALL OF THOSE FACTORS? THIS INVOLVES NO RECRUITMENT, NO MONEY BEING ADVANCED, NO VIOLENCE, NO ACTIVITY BEYOND POST DATES, WHICH ARE OFFENSIVE NO DOUBT ABOUT IT, AND THEN APPREHENSION AT THE AIRPORT.

HE'S VERY FORTUNATE HE WAS APPREHENDED BECAUSE WE WILL NEVER KNOW WHAT MIGHT HAVE HAPPENED AND PART OF YOUR ARGUMENT,

WHICH I THINK IS A FAIR ONE, IS THAT HAD MR. NATSHEH MADE IT TO SYRIA AND THEN FURTHER RADICALIZED AND BEING A CITIZEN AND COME BACK, WE DON'T KNOW WHAT WOULD HAVE HAPPENED. HE MIGHT HAVE BECOME DISSOLUTIONED.

HOWEVER, HE ALSO MIGHT HAVE COME BACK AND BECOME A DANGER TO THE UNITED STATES. SO I UNDERSTAND THE ARGUMENT.

BUT IN TERMS OF LOOKING AT ALL THE COMPARABLES, I DON'T -- YOU POINT OUT THESE COMPARABLES HAVE DIFFERENT FACTORS. I THINK THIS ONE HAS ZERO FACTORS BEYOND THE ABSOLUTE MOST BASIC UNLESS I MISREAD.

MS. BECKER: YOUR HONOR, THE GOVERNMENT WOULD RESPECTFULLY SUBMIT THAT THERE ARE OTHER FACTORS AT PLAY HERE AND THAT HE DOES NOT POSE SERIOUS THREAT ON ANY OF THOSE GROUNDS.

SO WHILE THE GOVERNMENT HAS NOT PRESENTED ANY EVIDENCE TO THE COURT THAT HE WAS OBTAINING MILITARY TRAINING IN THE UNITED STATES, THAT HE HAD ATTEMPTED TO PURCHASE ANY WEAPONS HERE, AS THE PSR REFLECTS, THERE WAS SOME DISCUSSION ABOUT WHETHER OR NOT AN ACT SHOULD BE COMMITTED IN THE UNITED STATES AND IN ADDITION THERE WAS --

THE COURT: I'M NOT -- I UNDERSTAND THAT, BUT I GUESS MY POINT WAS THAT WHEN I'M LOOKING AT THE COMPARABLES THAT BOTH SIDES ARE POINTING ME TO, IT APPEARS FROM THE SPECTRUM OF ACTIVITY THAT IN THE WORLD OF AN EFFORT TO JOIN A TERRORIST ORGANIZATION OR PARTICIPATE WITH A TERRORIST

ORGANIZATION, THIS APPEARS TO BE ON ONE END OF THE SPECTRUM THAT BEING WHEN I'M LOOKING AT THE COMPARABLES THE MINIMUM AMOUNT OF ACTIVITY. I JUST DON'T SEE ANY CASE IN WHICH THERE'S LESS.

AND I'M NOT SUGGESTING THAT IN AND OF ITSELF THAT'S NOT EXTRAORDINARILY SERIOUS, I DO, BUT ALL OF THE OTHER COMPARABLES SEEM TO HAVE SOMETHING ELSE GOING ON, YOU KNOW, ADVANCING MONEY, OR GOING TO TRAINING, OR, YOU KNOW, THAT KIND OF THING.

MS. BECKER: I THINK THERE ARE SEVERAL CASES THAT ARE SIMILARLY SITUATED AND THAT PEOPLE WERE ARRESTED AT THE AIRPORT ATTEMPTING TO TRAVEL. SOME HAD LIED ON THEIR PASSPORT TO GET THEIR PASSPORT. THERE MAY HAVE BEEN AN ADDITIONAL CHARGE OF THAT NATURE.

BUT TO THE EXTENT THAT THIS DEFENDANT WAS ATTEMPTING TO TRAVEL WITH A TRAVEL COMPANION WHERE HE HAD PURCHASED THE TICKET FOR THIS OTHER PERSON WHO WAS A JUVENILE WHERE THEY HAD HAD DISCUSSIONS ABOUT THE TRIP WHERE HE HAD COMMUNICATED WITH OTHERS ABOUT TRAVELLING AND JOINING ISIL, I'D SUBMIT --

THE COURT: THERE'S NO INDICATION THAT HE RECRUITED THAT INDIVIDUAL, RIGHT? IN FACT, THE INDIVIDUAL DIDN'T SHOW UP, AS I UNDERSTAND IT, BUT HE'S COORDINATING THE TRAVEL BUT HE'S -- YOU'RE NOT -- AT LEAST IT DIDN'T SEEM TO BE A SUGGESTION THAT HE HAD ACTIVELY RECRUITED THIS MINOR PARTICIPANT?

MS. BECKER: HE WAS PAYING FOR HIS TICKET.

03:02PM THE COURT: OKAY.

03:02PM MS. BECKER: SO I'M NOT GOING SO FAR AS SAYING WHOSE IDEA IT WAS TO TRAVEL. CERTAINLY THE JUVENILE PRESUMABLY INTENDED ON TRAVELLING AS WELL BUT WAS UNABLE TO COMPLETE HIS TRAVEL WHICH IS WHY HE DIDN'T SHOW UP AT THE AIRPORT, BUT NEVERTHELESS MR. NATSHEH IS THE ONE WHO PURCHASED THE TICKET AND WHO TOOK ALL OF THE PREPARATORY STEPS HERE TO OBTAIN A CREDIT CARD FOR THE PURPOSES OF BUYING THE TWO ROUND TRIP TICKETS.

03:02PM SO THE PLAN WAS HATCHED SEVERAL WEEKS AHEAD OF TIME. THERE HAD BEEN COMMUNICATIONS OVER A PERIOD OF MONTHS. OF COURSE HE HAD BEEN COMMUNICATING WITH SOMEONE IN ANOTHER COUNTRY ABOUT COMMITTING THE TRAVEL AS WELL.

03:03PM SO WHILE IT'S ON ONE END OF THE SPECTRUM, IT'S THE GOVERNMENT -- THE GOVERNMENT WOULD SUBMIT IT'S NOT AT THE LOWEST LEVEL POSSIBLE AT THAT END WHERE LITERALLY YOU HAVE A PERSON WHO DECIDED TO JOIN ISIL AND WENT TO THE AIRPORT AND ATTEMPTED TO TRAVEL.

03:03PM THERE WAS ONGOING DISCUSSION HERE OVER A PERIOD OF MONTHS. THERE WAS, AGAIN, ATTEMPT TO TRAVEL WITH ANOTHER INDIVIDUAL, PLANS THAT HAD BEEN MADE WITH A FEMALE IN ANOTHER COUNTRY. SO IT'S --

03:03PM THE COURT: YOU HAD INDICATED IN SOME OF THE RECORD THAT THERE WAS AN ACTUAL DISCUSSION ABOUT ENGAGING IN ACTIVITY IN THE UNITED STATES? CAN YOU POINT THAT OUT TO ME OR DIRECT

03:03PM ME TO THAT?

03:03PM MS. BECKER: IN PARAGRAPH 11 OF THE PSR, YOUR HONOR.

03:03PM THE COURT: OKAY.

03:03PM MS. BECKER: AND IT'S COMMUNICATION THAT -- THIS PARAGRAPH ACTUALLY REFERS TO HIS POST-ARREST STATEMENT IN WHICH HE MAKES REFERENCE TO IT.

03:04PM THE COURT: ADMITTED THAT ONE YEAR PRIOR HE THOUGHT ABOUT CONDUCTING AN ATTACK INSIDE OF THE UNITED STATES, IS THAT WHAT YOU'RE REFERRING?

03:04PM MS. BECKER: YES, YOUR HONOR. THERE WAS A DISCUSSION WITH THE MINOR WITH WHOM HE WAS GOING TO TRAVEL AS WELL.

03:04PM THE COURT: OKAY.

03:04PM MS. BECKER: WHEN IT WAS DETERMINED THAT HE WAS UNABLE TO TRAVEL, HE ASKED WHETHER OR NOT HE SHOULD DO SOMETHING, THE MINOR SHOULD COMMIT SOMETHING IN THE UNITED STATES AND THE MINOR -- I'M SORRY, AND MR. NATSHEH HAD SAID DON'T DO ANYTHING HERE, JUST TRY TO TRAVEL TO SYRIA.

03:04PM THE COURT: UH-HUH.

03:04PM LET ME SHIFT THE FOCUS FOR A MOMENT AND JUST ASK YOU ABOUT ALONG THE LINES OF CRAFTING AN APPROPRIATE SENTENCE, THERE WAS DISCUSSION IN YOUR PAPERS UNDERSTANDABLY ABOUT, YOU KNOW, THE DANGER OF RADICALIZATION AND ONE OF THE THINGS ANY SENTENCE IS TO BE DIRECTED TO IS TO AMELIORATE TO THE EXTENT THAT WE CAN AND MINIMIZE THAT.

IS THERE ANY OR ARE THERE ANY PROGRAMS AT ALL OTHER THAN SUPERVISED RELEASE, ANY SENTENCE OR CUSTODIAL PART OF THE SENTENCE THAT IS DIRECTIVE TO THE BUREAU OF PRISONS, OR ANYONE ELSE, DIRECTS TOWARDS THAT PROBLEM?

WE HAVE MENTAL HEALTH COUNSELLING, AND WE HAVE DRUG COUNSELLING, SUBSTANCE COUNSELLING. DO WE HAVE ANY OTHER KIND OF COUNSELLING OR IS THIS GOING TO JUST BE A SITUATION OF THE HOPE IS OVER A CERTAIN PERIOD OF TIME TO THE EXTENT THAT THERE IS ANY RADICALIZATION IT WILL GO AWAY?

MS. BECKER: NO. HOPEFULLY THERE WILL BE A MORE FOCUSSED APPROACH TO REHABILITATION BOTH WITHIN THE BUREAU OF PRISONS AND UPON RELEASE.

AS THE COURT MAY REALIZE, THIS IS THE FIRST CASE TO BE SENTENCED IN OUR DISTRICT AND SO, THEREFORE, I'M NOT FAMILIAR WITH WHETHER --

THE COURT: APPARENTLY 71 CASES, IF I READ SOME OF THE MATERIALS CORRECTLY. SO I WAS CURIOUS AND THOUGHT IT WAS RELEVANT IF THERE ARE PROGRAMS FOR THIS SPECIFIC CONCERN OUT THERE.

MS. BECKER: SO MAIN JUSTICE HAS BEEN ENGAGED IN COMMUNICATIONS WITH THE BUREAU OF PRISONS, AND THERE ARE PROGRAMS THAT ARE IN PLACE IN OTHER DISTRICTS WHERE THEY HAVE SEEN MORE CASES PROSECUTED AND CONVICTED AND SENTENCED.

SO, AGAIN, THIS IS --

THE COURT: IS THIS ON THE SUPERVISED RELEASE PART

OR THE CUSTODIAL PART?

MS. BECKER: BOTH IN THE BUREAU OF PRISONS AND ON SUPERVISED RELEASE OR OUT TO THE EXTENT THAT SOMEBODY HAS ACTUALLY NOT BEEN INCARCERATED YET OR SENTENCED YET.

SO, AGAIN, THIS IS NEW TO OUR DISTRICT. IT IS SOMETHING THAT WE WOULD HAVE TO DISCUSS IN TERMS OF SUPERVISED RELEASE WHEN A PERSON RETURNS TO OUR DISTRICT IN TERMS OF HOW THAT WOULD BE HANDLED.

BUT THERE ARE PROGRAMS IN PLACE IN AT LEAST A COUPLE OF DISTRICTS WHERE THEY ARE ADDRESSING THE SITUATION.

THE COURT: AND DO THE JUDGMENT AND COMMITMENT ORDERS IN THOSE CASES HAVE ANY SOMEWHAT LIKE THE ANALOG AND THE DRUG AREAS, RDAP AS WE ALL KNOW, IS THERE SOME PROGRAM THAT YOU CAN -- THAT THE JUDGE CAN RECOMMEND THAT THE DEFENDANT PARTICIPATE IN?

MS. BECKER: YOUR HONOR, I'M NOT FAMILIAR WITH WHETHER OR NOT IT'S A SPECIALLY NAMED PROGRAM.

WHAT I HAVE LEARNED ABOUT IT IS THAT IT'S SIMILAR TO OTHER REHABILITATIVE PROGRAMS IN PLACE. I DON'T KNOW WHETHER OR NOT IT HAS BEEN CATEGORIZED IN AND OF ITSELF. THAT CERTAINLY IS SOMETHING THAT I CAN LOOK INTO, BUT I'M NOT AWARE OF IT AT THIS TIME.

THE COURT: DO YOU HAPPEN TO KNOW MS. SPITALIERI?

PROBATION OFFICER: I DO NOT BELIEVE THERE'S ANY SPECIFIED PROGRAMS FOR THAT. I THINK THEY WOULD JUST USE IT AS

KIND OF A COMPONENT OF A MENTAL HEALTH PROGRAM AND JUST MAKE IT MORE FOCUSSED.

AT LEAST ON THE SUPERVISED RELEASE SIDE, SINCE THIS IS GOING TO BE ONE OF OUR FIRST CASES WITH THIS TYPE OF SITUATION, IT WOULD PROBABLY BE CONTACTING THE OTHER DISTRICTS AND FINDING OUT WHAT PROGRAMS THEY HAVE IN PLACE AND TRY TO IMPLEMENT SOMETHING VERY SIMILAR TO THAT THROUGH THE MENTAL HEALTH TREATMENT.

MS. MITCHELL: YOUR HONOR, I CAN SPEAK ON THIS ALSO.

THE COURT: GREAT.

MS. MITCHELL: SO THERE IS ACTUALLY NO PARTICULAR PROGRAM CURRENTLY SET UP IN THE BUREAU OF PRISONS TO TREAT INDIVIDUALS WHO ARE ACCUSED OF THIS AND IN THE PROCESS OF INDIVIDUALS GOING THROUGH RADICALIZATION.

WHAT HAS HAPPENED RECENTLY IS THERE'S A DISTRICT COURT IN MINNESOTA AND MINNEAPOLIS THAT HAS HAD A NUMBER OF CASES RELATED TO SOMALIANS WHO HAVE BEEN RECRUITED TO PARTICIPATE IN TERRORIST TYPE OF ACTIVITIES. THE DISTRICT COURT JUDGE THERE TOOK A PARTICULAR INTEREST IN THIS TOPIC AND WANTED TO TRY AND NIP IT IN THE BUD BECAUSE THEY HAD SUCH A LARGE SOMALIAN POPULATION THERE THAT HAD BEEN RELOCATED AS REFUGEES AND, IN FACT, SPECIFICALLY THERE WERE A NUMBER OF INDIVIDUALS WHO WERE REACHING OUT TO OTHER PEOPLE IN THE COMMUNITY TO JOIN INTO ISIL OR SUPPORT THE ACTIVITIES THERE.

WHAT HAPPENED WAS THAT JUDGE REACHED OUT TO PROBATION AND

THE BUREAU OF PRISONS DISCOVERED THAT THERE WAS NO PARTICULAR PROGRAM IN PLACE. THEY ALSO REACHED OUT TO PRETRIAL.

THE JUDGE THERE THEN PASSED THE U.S. ATTORNEY AND FEDERAL PUBLIC DEFENDER WHO WERE INVOLVED IN THOSE CASES. THE FEDERAL PUBLIC DEFENDER THERE IS MANNY ATWAL, AND I'VE SPOKEN WITH HER AT LENGTH ABOUT WHAT IS GOING ON THERE. SHE IS ACTUALLY A CITIZEN IN THE U.K. AND WAS PERMITTED TO TRAVEL TO THE U.K. AND WITH SPECIFIC DIRECTIVES FROM THE JUDGE THERE TO FIND OUT WHAT THEY WERE DOING FOR THEIR RADICALIZATION PROGRAM THERE.

AS A RESULT OF THAT THEY'VE BROUGHT BACK SOME WORK THAT THEY HAVE BEEN DOING THERE OR ESPECIALLY WITH PRETRIAL RELEASE WITH INDIVIDUALS WHO WERE ACCUSED OF TERRORISM CASES THERE. IT HAS A SPECIFIC NAME FOR THE PROGRAM, AND IT SLIPS MY MIND RIGHT NOW, BUT THEIR PROGRAM IS SPECIFICALLY DESIGNED SO THAT INDIVIDUALS ON PRETRIAL RELEASE CAN START THE PROCESS OF DERADICALIZATION AND THEY GO THROUGH A RATHER LENGTHY AND SUBSTANTIAL PROCESS.

THE BUREAU OF PRISONS AND DEPARTMENT OF JUSTICE HAVE TAKEN A LOOK AT THIS PROGRAM AND THEY'RE GOING TO TRY AND INCORPORATE THE TRAINING THAT PRETRIAL HAS BEEN GIVING THERE AND DELIVER THAT TO THE PROBATION OFFICERS NATIONWIDE. HOWEVER, THAT HAS NOT COME INTO PLACE.

SPECIFICALLY WHAT HAS HAPPENED IS THAT THE BUREAU -- THE DEPARTMENT OF JUSTICE AND THE DISTRICT COURT JUDGE IN THAT SITUATION HAVE REACHED OUT TO SOMEONE WHO HAS BEEN INVOLVED IN

DERADICALIZATION FOR A LONG PERIOD OF TIME IN THE U.K. AND WHERE THEY ARE A LITTLE FURTHER ALONG THAN US ON THIS SITUATION AND HE HAS GONE THROUGH THE PROCESS OF MEETING WITH INDIVIDUALS WHO HAD A -- KIND OF A MATRIX FOR DETERMINING HOW RADICALIZED THEY ARE AND THEN DETERMINES WHAT KIND OF PROCESS WOULD NEED TO HAPPEN FOR DERADICALIZATION FOR THAT PERSON AND THEN ALSO WHAT KINDS OF THERAPY THAT THEY CAN ENGAGE IN FOR PRETRIAL RELEASE AND WHETHER OR NOT THAT WOULD BE APPROPRIATE.

MY UNDERSTANDING IS THAT THAT PERSON HAS STARTED TO TRAIN THE PROBATION OFFICERS AND PRETRIAL OFFICERS BOTH IN MINNEAPOLIS AND IN A FEW OTHER DISTRICTS WHERE THESE TYPES OF CASES HAVE BEEN MORE PREVALENT, BUT TO MY KNOWLEDGE THE BUREAU OF PRISONS HAS NO PROGRAM IN PLACE FOR ANY DERADICALIZATIONS RIGHT NOW WHICH IS PART OF THE REASON WHY THE JUDGE THERE WAS SPECIFICALLY LOOKING TO OUTSIDE SOURCES TO GET A PROGRAM STARTED AND PROBATION AT THE CURRENT TIME DOES NOT HAVE A FULLY FORMULATED PROGRAM BUT EVENTUALLY THEY WILL.

THE COURT: OKAY. THANK YOU. YOU CAN SHIFT BACK NOW TO WHATEVER ISSUES YOU WANT TO HIGHLIGHT FOR ME.

MS. MITCHELL: SO I THINK WE'VE EXHAUSTIVELY ATTEMPTED TO BRIEF EVERYTHING THAT WE THINK THE COURT SHOULD BE AWARE OF IN THE CASE OF MR. NATSHEH, BUT WE WANT TO JUST BRIEFLY TOUCH ON SOME OF THE ISSUES THAT THE COURT JUST BROUGHT UP IN SPEAKING WITH THE U.S. ATTORNEY'S OFFICE IN THAT -- IN COMPARISON WITH A LOT OF THE OTHER CASES.

03:11PM WHAT THE COURT CAN SEE IS THAT MR. NATSHEH DOES NOT HAVE A LOT OF THE AGGRAVATING FACTORS THAT WERE PRESENT IN A NUMBER OF THE OTHER CASES. I SPECIFICALLY BROUGHT UP THE CASE I THINK IT WAS MS. CONNOLLY WHO RECEIVED THE 48-MONTH SENTENCE OUT OF COLORADO WHO JOINED A U.S. ARMY PROGRAM AND SHE RECEIVED FIRST AID TRAINING AND SHE HAD FIREARM TRAINING AND THE FBI MET WITH HER MULTIPLE TIMES BEFORE SHE WAS ACTUALLY ARRESTED AT THE AIRPORT AS A COMPARISON TO WHAT WAS GOING ON IN MR. NATSHEH'S CASE.

AND THEN I WOULD ALSO DRAW THE COURT'S ATTENTION TO A NUMBER OF OTHER CASES THAT I HAVE RECENTLY BECOME AWARE OF IN SPEAKING FURTHER WITH MS. ATWAL IN MINNEAPOLIS. HER TWO CLIENTS INVOLVED IN THE CASES THAT THE JUDGE THERE HAD RECENTLY BEEN SENTENCED. ONE RECEIVED PROBATION. ANOTHER CLIENT RECEIVED A SENTENCE OF LESS THAN EIGHT YEARS OR TEN YEARS AND ONE RECEIVED A SENTENCE OF I BELIEVE LESS THAN FOUR YEARS.

IN EACH OF THOSE CASES WHAT THE JUDGE BASICALLY NOTICED WAS THAT TIME IN CUSTODY IS NOT GOING TO MAKE ANY DIFFERENCE FOR ANY OF THESE INDIVIDUALS. THERE ARE PROGRAMS THAT HELPED WITH ANTI-RADICALIZATION. THERE'S NOT -- IT'S A SITUATION WHERE INDIVIDUALS WERE MAKING DECISIONS BASED OFF OF WHAT THEY BELIEVED WAS SOMETHING THAT THEY WERE GOING TO DO AND IN A LARGE PART FOR WHAT HE SAW WAS A HUMANITARIAN REASON. THESE WERE INDIVIDUALS WHO HAD DONE THINGS HERE IN THE UNITED STATES WHO WERE SAYING THEMSELVES WHO WERE PREPARING TO UNDERTAKE

VIOLENT ACTIONS, BUT THEY HAD ALL BEEN RECRUITED TO ISIL, AS I MENTIONED, PRE-2015 WHEN ISIL'S DIRECTIONS AND PROPAGANDA WERE MORE DIRECTED TOWARDS A HUMANITARIAN BET.

YES, THEY POSTED PICTURES OF THEMSELVES WITH GUNS AND, YES, THEY POSTED PICTURES OF THEMSELVES DOING CERTAIN THINGS BUT THEY WERE DOING SO AS WE ARE FREEDOM FIGHTERS AND WE'RE TRYING TO HELP OUR BROTHERS WITH FIGHTING ARMS IN SYRIA.

THE COURT: BUT AS MS. BECKER DIRECTED ME TO, I REALIZE THERE ARE SOME ASPECTS OF THE STATEMENT THAT INDICATES MR. NATSHEH BACKED OFF FROM IT AND THEN ALSO ENCOURAGED THE MINOR INDIVIDUAL WE DISCUSSED NOT TO ENGAGE IN ANY ACTIVITIES.

BUT AT ONE POINT HE CONSIDERED ENGAGING IN VIOLENT CONDUCT IN THIS COUNTRY.

MS. MITCHELL: AND THEN MADE THE CORRECT DECISION NOT TO.

THE COURT: WELL, TRUE.

MS. MITCHELL: BUT THAT'S A SIGN OF -- HE SPECIFICALLY TOLD THE JUVENILE DO NOT DO ANYTHING HERE IN THE UNITED STATES.

AND --

THE COURT: BUT TO SOME EXTENT TO YOUR POINT THAT THE MOTIVATION HERE IS ENTIRELY FOCUSSED ON YOU SAID SOMETHING TO THE EFFECT OF HUMANITARIAN ASPECTS OF THIS. I DON'T THINK I CAN CHARACTERIZE IT IN THAT FASHION.

MS. MITCHELL: I WOULDN'T SAY WHOLLY BUT IT WAS --

THE PROPAGANDA THAT ISIL WAS DIRECTING TOWARDS INDIVIDUALS IN AN ATTEMPT TO RECRUIT THEM WAS NOT AS AN EXPERT HAD NOTICED IN 2015, MID-2015, THE SHIFT IN WHAT THEY WERE DOING AND HOW THEY PRESENTED THEMSELVES CHANGED.

ISIL CHANGED FROM A DIRECTIVE MORE TOWARDS -- AND THIS IS DEEP INTO THE PROPAGANDA. IT'S NOT THE SURFACE STUFF THAT WE ALL SEE AND WE GET AGHAST AT. IT IS THE CALL TO WE HAVE PEOPLE HERE THAT WE SHOULD FEEL SOLIDARITY WITH AND WE'RE SEPARATING. NO ONE IS DOING ANYTHING ABOUT IT, AND WE NEED TO BE THE PEOPLE.

THE COURT: NO. I READ THROUGH THE EXTENSIVE BACKGROUND THAT YOU'VE PROVIDED FOR ME.

YOU KNOW, THE ISSUE THAT I WAS DISCUSSING WITH MS. BECKER THAT I'M MULLING OVER IS, AS I INDICATED BEFORE, AND I THINK SHE DOESN'T DIRECTLY DISPUTE, MR. NATSHEH WAS APPREHENDED AT A POINT WHERE VERY LITTLE IN TERMS OF ACTUAL EFFORT HAD TAKEN PLACE. SO IT WAS EARLY IN THE GAME, IF YOU WILL.

MS. MITCHELL: YES, THAT IS CORRECT.

THE COURT: THAT IS BOTH IN THE ONE SENSE FORTUNATE, VERY FORTUNATE FOR HIM THAT HE WAS APPREHENDED IN MANY WAYS.

BUT THEN THE QUESTION IS, TO PUT IT QUITE BLUNTLY, HOW MUCH CREDIT DOES HE GET FOR HAVING BEEN STOPPED EARLY IN THE PROCESS? HE DOES REPRESENT THE PROSPECT THAT HAD HE SUCCEEDED IN GOING TO SYRIA, HE WAS, AS THE GOVERNMENT POINTS OUT, AN AMERICAN CITIZEN, HAD THE RADICALIZATION GONE A BAD WAY, HE

COULD HAVE WELL RETURNED TO THE UNITED STATES AND POSED A SIGNIFICANT DANGER.

SO, IN OTHER WORDS, YES, IN TERMS OF LOOKING AT SOME OF THE COMPARABLES, HE'S IN THE GROUP THAT DIDN'T GET VERY FAR, BUT SHOULDN'T I TAKE INTO ACCOUNT THE PROSPECT THAT HAD HE GOTTEN AS FAR AS HE WANTED, HE COULD REPRESENT A VERY SERIOUS DANGER TO THE UNITED STATES?

MS. MITCHELL: THE COURT CAN TAKE THAT INTO CONSIDERATION, BUT THE COURT CAN ALSO TAKE INTO CONSIDERATION THAT MR. NATSHEH COULD HAVE GOTTEN TO TURKEY AND DECIDED TO COME BACK OR HE COULD HAVE GOTTEN TO SYRIA, THE BORDER, AND DECIDED TO COME BACK.

THE COURT: SHOULD I MAKE ALL OF THE INFERENCES IN HIS FAVOR?

MS. MITCHELL: I DON'T THINK THAT THE COURT HAS TO MAKE ANY INFERENCES ONE WAY OR ANOTHER ABOUT HOW IT COULD HAVE GONE WORSE OR IT COULD HAVE GONE BETTER.

FRANKLY, THE PROBLEM IS WITH THIS OFFENSE, HE COMMITTED -- THE MOMENT HE PURCHASED THE PLANE TICKET IS WHEN THE GOVERNMENT ESSENTIALLY COULD HAVE ARRESTED HIM FOR IT AND ANYWHERE ALONG THAT LINE MANY DIFFERENT THINGS COULD HAVE HAPPENED ONE WAY OR ANOTHER.

THE COURT: TRUE.

MS. MITCHELL: MR. NATSHEH, HOWEVER, WAS STOPPED AT A POINT WHERE ALL OF THE THINGS LEADING UP TO THE POINT WHERE

HE WAS STOPPED THE COURT CAN LOOK AT AS DEFINITIVE SIGNS THAT THIS IS VERY LOW ON THE SCALE OF OTHER INDIVIDUALS WHO HAVE TAKEN A MUCH GREATER PREPARATION AND INVOLVED OTHER PEOPLE AND DONE FINANCIAL CONTRIBUTIONS, AND MANY OTHER THINGS THAT HE HIMSELF NOT DONE.

WHAT THE COURT CAN ALSO TAKE INTO CONSIDERATION IS WHERE HE IS AND WHAT IS MORE LIKELY TO HAPPEN TO HIM AFTER HE GETS RELEASED. HE'S STILL A VERY YOUNG MAN WHO HAS NOT EXHIBITED TO MYSELF, I THINK TO THE GOVERNMENT, SIGNS THAT HE IS NOT A PERSON WHO COULD BE A U.S. CITIZEN WITH NO DANGER TO ANYONE ELSE.

HE IS NOT SO RADICALIZED THAT HE STRIKES FEAR WITH EVERYTHING HE SAYS; THAT HE CANNOT AND WILL NOT BE A PERSON WHO CAN CONTRIBUTE TO SOCIETY. HE'S A 21-YEAR-OLD AND WHO ACTS LIKE A 21-YEAR-OLD DOES AND WHO THINKS LIKE A 21-YEAR-OLD DOES.

HE HAS NOT HAD THE CHANCE YET TO REALLY TAKE A LOOK AT WHERE HE WAS GOING IN HIS LIFE. AND WHAT WAS GOING ON AND REALLY THINK THROUGH WHAT WAS HAPPENING.

INSTEAD, HE GOT A CREDIT CARD. HE DIDN'T SAVE UP MONEY FOR MONTHS TO BE ABLE TO MAKE THIS TRIP. HE HAD NO OTHER FUNDS WITH HIM ASIDE FROM A CREDIT CARD THAT HE WAS GOING TO USE TO MAKE THIS TRIP. THIS IS NOT A WELL-THOUGHT-OUT PLAN OF A PERSON WHO HAS BEEN THINKING ABOUT DOING THIS FOREVER AND ACTUALLY TAKING STEPS TO DOING IT.

THIS IS A TEENAGER WHO IS SO DEPRESSED THAT HE SPENT A

WEEK IN HIS ROOM AND DIDN'T EAT OR DRINK AND HAD HIS PARENTS CALLING FAMILY FRIENDS WHO THEN GOT ON THE PHONE WITH HIM WHILE HE SOBBED AND HIM SAYING I'M SO DEPRESSED AND I CAN'T FIGURE OUT WHAT TO DO WITH MY LIFE.

THE COURT: OF COURSE THE DILEMMA WE FACE IS THE PROFILE IS PRECISELY A PROFILE OF SOMEONE WHO CAN BE QUITE DANGEROUS.

MS. MITCHELL: AND IT IS ALSO THE PROFILE OF A PERSON WHO IF GIVEN A CHANCE TO GROW UP AND GIVE THEM SOME MATURITY AND THINK ABOUT THINGS AND WHO COULD COME OUT OF CUSTODY AND BE PERFECTLY FINE. AND THAT'S WHO I BELIEVE HE IS.

WHILE THE GOVERNMENT ATTEMPTS TO DISCOUNT SOME OF THE FACTORS THAT WE'VE BROUGHT FORTH, THE STRONG FAMILY INVOLVEMENT, I THINK IT'S VERY CLEAR THAT HAD ANY OF THE FAMILY MEMBERS ACTUALLY KNOWN THAT HIS ACT OF GETTING ON THE PLANE, HIS FATHER WHO HAD DEMONSTRATED SOME STRONG DISCIPLINE BEFORE WOULD HAVE CONTINUED TO DO THAT AND DONE EVERYTHING IN HIS POWER TO PREVENT HIM FROM DOING THAT.

THAT HE COOPERATED WITH LAW ENFORCEMENT WHILE THE GOVERNMENT SAYS THAT THAT'S GREAT THAT HE DID THAT, I THINK THAT THAT SHOWS THAT MR. NATSHEH IS APPROACHABLE, THAT HE'S AMENABLE TO WORKING WITH OTHERS AND THAT HE WAS ATTEMPTING TO TRY TO MAKE RIGHT WHAT HAPPENED.

THAT HE HAD BEEN SUFFERING FROM DEPRESSION FOR A VERY LONG PERIOD OF TIME, AND THAT WAS DEMONSTRATED BY OTHER PEOPLE.

WHILE MR. NATSHEH DIDN'T HAVE LONG-TERM CONTACTS WITH DOCTORS, HE DID HAVE VERY RECOGNIZABLE SIGNS THAT WERE VISIBLE TO EVERYONE ELSE WHO COULD SAY THAT THIS IS A PERSON WHO WAS DEPRESSED, AND THEY WERE TRYING TO GET HIM SOME ASSISTANCE.

IT IS VERY EASY TO SAY THAT IT IS A SCARY THING THAT HE WAS GOING TO DO AND ISIL IS A VERY SCARY ORGANIZATION SO WE SHOULD PUT HIM IN CUSTODY FOR A LONG TIME.

BUT FOR WHO HE IS AND THE STEPS THAT HE ACTUALLY TOOK IN ANTICIPATION OF GETTING ON THE PLANE, I THINK THAT IT'S APPARENT THAT FIRST A LOWER SENTENCE IS APPROPRIATE FOR HIM, AND, IN FACT, THAT NOW THAT WE'RE GETTING AND STARTING TO LOOK AT MORE OF THESE TYPES OF CASES WHERE THE GOVERNMENT IS ACTUALLY BEING ABLE TO GO THROUGH AND DO THE PROSECUTION AND INVOLVING THE SCIENCE, WHICH IS SOMETHING THAT HAS RECENTLY STARTED HAPPENING WITH RADICALIZATION AND WHY PEOPLE BECOME RADICALIZED, I THINK WE'RE ON A TREND OF SEEING SOME OF THESE TYPES OF CASES WHERE WE START GETTING MORE DOCTORS AND MORE PEOPLE INVOLVED WHERE WE CAN SAY THIS IS A PERSON WHO IS OF CONCERN BECAUSE OF THE ACTS THAT THEY HAVE DONE AND IN THIS CASE I DON'T SEE THAT WITH MR. NATSHEH. I DON'T SEE THE NEED TO PUT HIM AWAY FOR A LONG PERIOD.

FRANKLY, I THINK FOUR YEARS IS STILL A VERY SUBSTANTIAL AMOUNT OF TIME FOR THIS OFFENSE, BUT IN COMPARISON TO THE OTHER TYPES OF OFFENSES THAT ARE OUT THERE, THE OTHER SENTENCES THAT ARE OUT THERE, I THOUGHT IT WAS A REASONABLE SENTENCE TO US.

THE COURT: BEFORE I GOT TO MR. NATSHEH, MS. BECKER.

MS. BECKER: THANK YOU, YOUR HONOR. I WOULD LIKE TO ADDRESS A FEW OF THE ISSUES THAT BOTH THE COURT AND MS. MITCHELL RAISED.

WITH RESPECT TO PROPAGANDA, WHILE IT DOES SEEM CLEAR THAT MR. NATSHEH DID ACCOMPLISH SOME PROPAGANDA, IT'S IMPORTANT TO KNOW THE TYPE OF PROPAGANDA THAT HE WAS FOLLOWING INCLUDING, AS PUT IN OUR PAPERS AND AS TERRIBLE AS IT IS TO REPEAT, THE PROPAGANDA THAT HE WAS FOLLOWING AND REPOSTING AND SHARING WITH OTHERS WAS THAT OF THAT CAGED JORDANIAN PILOT WHO WAS BURNED ALIVE. THAT'S THE PROPAGANDA HE WAS FOLLOWING, NOT A NIKE AD WITH ISIL OR A SNICKERS AD WITH ISIL. HE WAS INTERESTED IN THE MOST BRUTAL OF PROPAGANDA.

I WOULD ALSO DISAGREE WITH THE IDEA THAT THE DEFENDANT WAS APPREHENDED EARLY IN THE GAME. THE GOVERNMENT'S POINT IS ACTUALLY TO THE CONTRARY. HE WAS APPREHENDED AT THE VERY END OF THE GAME. HE WAS ARRESTED AS HE WAS ABOUT TO BOARD HIS PLANE. THERE WAS NOTHING LEFT FOR HIM TO DO TO COMPLETE THE ACT OTHER THAN TO GET THERE.

EVERY OTHER ASPECT OF MATERIAL SUPPORT WAS COMMITTED. YOU DON'T HAVE TO TRAIN IN THE UNITED STATES PRIOR TO LEAVING IN ORDER TO COMMIT AN ACT OF TERRORISM ELSEWHERE. YOU DON'T HAVE TO KNOW THOSE COMBAT SKILLS. HE WAS INTENDING ON FIGHTING THERE REGARDLESS OF WHETHER OR NOT HE LEARNED HOW TO DO SO HERE OR HE LEARNED HOW TO DO SO THERE.

SO HE WAS ACTUALLY ARRESTED AT THE VERY LAST STEP, NOT -- IT MAY SEEM --

THE COURT: WELL, THAT'S TRUE, BUT THAT, TOO, FOR PURPOSES OF COMPLETING THE OFFENSE, I DON'T DISAGREE WITH YOU BUT IN TERMS OF ASSESSING THE RAMIFICATIONS OF -- THERE'S NO DOUBT THAT HE COMMITTED WHAT HE NEEDED TO COMMIT TO BE ADJUDGED GUILTY, AND I TOOK HIS PLEA. AND IF HE DIDN'T, I WOULDN'T HAVE TAKEN HIS PLEA.

BUT IT IS -- THERE IS -- IT COULD HAVE -- IT CONCLUDED WITH THAT, FRANKLY. HE COULD HAVE GONE OFF TO SYRIA AND WE NEVER HEARD OF HIM AGAIN. I MEAN, WE DON'T KNOW.

SO WHEN YOU COMPARE THAT TO THE OTHER CASES THAT YOU VIEW, AND MS. MITCHELL HAS PROVIDED TO ME, WHERE THERE IS MORE ACTIVITY IN CONJUNCTION WITH THE COMPLETION OF THE OFFENSE, THAT WAS MY POINT. I'M NOT SUGGESTING THAT HE DIDN'T COMPLETE THE OFFENSE BECAUSE I TOOK HIS PLEA.

MS. BECKER: YES, YOUR HONOR. I THINK COMPARED TO THE OTHER CASES, THERE ARE SOME CASES, YOU KNOW, I DON'T WANT TO REPEAT MYSELF, THAT ARE SIMILARLY SITUATED, AND THERE ARE OBVIOUSLY SOME, YES, THAT ARE MUCH MORE EGREGIOUS IN TERMS OF THE PREPARATION.

BUT AS MS. MITCHELL WAS COMMENTING ON MR. NATSHEH'S PREPARATION, THIS WAS NOT AN IMPULSIVE ACT ON HIS PART WHATSOEVER. HE HAD EXPRESSED FOR MONTHS AN INTEREST IN ISIL. HE WAS INTERVIEWED BY LAW ENFORCEMENT AUTHORITIES AT WHICH TIME

HE STATED THAT HE HAD CHANGED HIS WAYS AND HE WAS NO LONGER INTERESTED IN PURSUING THAT -- THOSE -- THAT WAY OR HIS THOUGHTS.

THE COURT: THE IMPORTANCE, THOUGH, IN MY MIND OF THIS ADDITIONAL ACTIVITY IS NOT JUST THAT THERE IS ADDITIONAL ACTIVITY.

IT'S JUST THAT WE CAN GLEAN FROM IN SOME OF THOSE CASES THE ADDITIONAL ACTIVITY GIVES US A PRETTY GOOD WINDOW OF THE INTENTION OF THE DEFENDANT.

IN THIS CASE WE HAVE ONE CLEAR INTENTION AND THAT IS TO GO TO SYRIA AND JOIN THIS ORGANIZATION. THAT'S THE ONLY REAL INTENTION THAT WE KNOW OF AT THIS POINT WHEREAS SOME OF THE OTHER CASES WHEN THERE ARE -- WHEN THEY'RE RECRUITING OTHERS AND WHEN THEY ARE DOING THAT KIND OF ACTIVITY, THAT'S AN ADDITIONAL HARM AND DANGER TO THE UNITED STATES BY DOING THAT.

SO THE POINT IS SIMPLY THAT WITH THAT ADDITIONAL ACTIVITY YOU CAN REALLY ASSESS THE MAGNITUDE OF THE DANGER IN A WAY THAT I THINK I'M HAVING A HARD TIME OF DOING HERE.

MS. BECKER: UNDERSTOOD. I DON'T HAVE ANY OTHER FACTS TO OFFER TO THE COURT OTHER THAN THE INTENDED TRAVEL WITH A MINOR.

THE COURT: RIGHT.

MS. BECKER: WE'RE NOT AWARE OF HIM OBTAINING MILITARY TRAINING IN THE UNITED STATES PRIOR TO LEAVING. WE DON'T KNOW WHAT WOULD HAVE HAPPENED HAD HE RETURNED TO THE

03:26PM UNITED STATES. THERE ARE MANY OPEN QUESTIONS. SO THE GOVERNMENT AGREES WITH ALL THAT IT'S FORTUNATE THAT HE WAS STOPPED AT THE AIRPORT SO THAT BOTH HIS LIFE AND OTHERS WERE PROTECTED.

BUT GOING BACK TO THE THOUGHT THAT THIS WAS NOT AN IMPULSIVE ACT ON HIS PART, AGAIN, HE HAD BEEN COMMUNICATING FOR MONTHS ABOUT HIS INTENT TO JOIN ISIL. HE OBVIOUSLY HAD ALREADY BEEN RADICALIZED AND HAD BEEN COMMUNICATING WITH A MINOR ABOUT COMMITTING ACTS OVERSEAS. HE DID OPEN UP A NEW LINE OF CREDIT TO PURCHASE A TICKET AND HE EMPTIED HIS BANK ACCOUNT PRIOR TO LEAVING. THIS WAS A CONCERTED PLAN, AGAIN, NOT JUST SHOWING UP AT THE AIRPORT AND DECIDED TO GO FOR THE DAY.

SO MS. MITCHELL HAS OBVIOUSLY POINTED OUT SENTENCES THAT ARE AT THE LOW END. AS THE COURT HAS REVIEWED THE REPORT THAT WAS ATTACHED TO THE GOVERNMENT'S FIRST SENTENCING MEMORANDUM, THERE ARE OBVIOUSLY A NUMBER OF SENTENCES THAT ARE AT THE OTHER END. AGAIN, MANY OF THOSE CASES INVOLVE DIFFERENT CIRCUMSTANCES THAN THE CASE AT HAND, BUT, AGAIN, THERE ARE SEVERAL LETTERS STILL WITHIN THE HEARTLAND OF WHAT WE'RE LOOKING AT. AT THE TIME OF THE SENTENCES IN ALL OF THOSE CASES THE STATUTORY MAXIMUM WAS 15 YEARS AND THERE ARE, IN FACT, SEVERAL DEFENDANTS WHO RECEIVED 15 YEARS WHETHER THEY PLED OR WERE CONVICTED AT TRIAL.

THERE ARE SOME WHO RECEIVED A SLIGHTLY LESSER SENTENCE OF 10 YEARS, AND THAT IS, IN FACT, WHAT THE GOVERNMENT IS

RECOMMENDING HERE BY RECOMMENDING 15 YEARS. THE STATUTORY MAXIMUM CHANGED IN THE MEANTIME TO 20 YEARS. THE GOVERNMENT IS RECOMMENDING A SENTENCE OF 15 YEARS AS BEING APPROPRIATE. GIVEN THE CIRCUMSTANCES OF THIS CASE, THEY ARE NOT AS EGREGIOUS AS SOME OF THE OTHERS BUT NEVERTHELESS DEMONSTRATE 100 PERCENT COMMITMENT TO COMMITTING THE ACT AS MUCH AS ANY OTHER DEFENDANTS IN ANY OF THOSE CASES.

THE COURT: THANK YOU.

MR. NATSHEH, THIS IS YOUR SENTENCING. YOU HAVE A RIGHT TO SPEAK DIRECTLY TO ME. YOU'RE NOT OBLIGATED TO DO SO. IT'S UP TO YOU.

BUT IF THERE IS ANYTHING YOU WANT TO SAY, NOW WOULD BE THE TIME TO SAY IT.

THE DEFENDANT: SO I JUST WANT TO SAY THAT --

THE COURT: WHY DON'T YOU MOVE THE MICROPHONE CLOSER TO YOU.

THE DEFENDANT: SO I JUST WANT TO SAY THAT I'M FULLY AWARE OF THE NATURE OF MY CRIME AND THE CONSEQUENCES THAT MY ACTIONS HAVE YIELD, AND WHAT I TRIED TO DO IS VERY WRONG AND IT SOUNDS REALLY UGLY, BUT I'M VERY FORTUNATE THAT I'M HERE EVEN THOUGH I'M INCARCERATED. MY DAD TELLS ME THAT ALL OF THE TIME BECAUSE THERE'S NO GUARANTEE THAT --

THE COURT: HE'S RIGHT.

THE DEFENDANT: -- THERE'S NO GUARANTEE THAT IF I WOULD HAVE SUCCESSFULLY MADE IT TO SYRIA THAT I WOULD BE ALIVE.

THE CONTEXT OF MY CRIME REQUIRED ME TO ABANDON MY FAMILY WITHOUT THE POSSIBILITY OF EVER SEEING THEM AGAIN, AND IT WAS REALLY AN ACT OF SELFISHNESS, AND I DIDN'T REALIZE HOW MUCH MY FAMILY NEEDED ME. IT WAS A DESPERATE ATTEMPT TO TRY TO DO SOMETHING TO MAKE MYSELF FEEL GOOD BY TRYING TO HELP OTHERS.

SO I KNOW THAT I HAVE A PROBLEM, AND I UNDERSTAND THAT I DO HAVE THE PROBLEM. AND I DON'T KNOW THE WAY THE DRUG PROGRAMS DO IT, BUT THE FIRST THING IS THAT YOU ACKNOWLEDGE THAT YOU HAVE A PROBLEM AND THEN YOU TRY TO SEE HOW IT HAPPENED.

SO I'VE READ A LOT INTO THE SUBJECT, AND I WAS REALLY MOVED EMOTIONALLY BY THE HUMANITARIAN CRISIS IN SYRIA, AND IT'S NOT AN UNDERSTATEMENT THAT THEY TOOK THAT OPPORTUNITY TO TAKE ADVANTAGE OF OUR EMOTIONS. REALLY THAT'S WHAT I WANTED TO DO WAS TO TRY TO HELP PEOPLE.

YOU KNOW, I HAVE A HISTORY OF DOING A LOT OF CHARITY WORK AND RAISING MONEY FOR THE PALESTINIANS IN GAZA AND FOR THE DROUGHT IN WEST AFRICA AND FOR MANY OTHER THINGS. AND THAT'S REALLY WHAT I WAS TRYING TO DO. IT JUST SOUNDS REALLY UGLY. IT'S A TERRORIST ORGANIZATION.

THE CHARGE IS A TERRORISM CHARGE, BUT I THINK IT'S -- MY CASE IS LESS SERIOUS THAN IT REALLY SOUNDS, BUT I'M NOT TRYING TO JUSTIFY WHAT I TRIED TO DO. IT WAS WRONG. I WAS IGNORANT. I WAS NAIVE. I WAS IMMATURE. AND I WAS JUST -- THE MOMENTS BEFORE GETTING A -- BEFORE TRYING TO GET ON THE PLANE I JUST --

03:30PM MY WHOLE THINKING WAS JUST CLOUDY AND NOW I CAN SEE THAT THERE'S SO MANY DIFFERENT WAYS THAT I COULD HAVE HAD HELP BUT, YOU KNOW, MY OLD WAY OF THINKING WAS WRONG, THE WAY I TRIED TO HELP THE PEOPLE WAS WRONG, AND I LOST DIRECTION.

AND I'M GOING TO BETTER MYSELF, AND I HAVE THE SUPPORT OF MY FAMILY, MY FRIENDS. I LOVE THEM. THEY'VE REALLY HELPED ME IN THIS PROCESS TO TRANSITION FROM MY OLD WAY OF THINKING. SO THAT'S WHAT I'VE BEEN FOCUSSING ON IN THE PAST 11 MONTHS, FOCUSSING ON RESTRUCTURING MYSELF MENTALLY, PSYCHOLOGICALLY, AND I'VE REALIGNED MY FOCUS ON FINISHING MY EDUCATION, BUILDING A STRONG BOND WITH FAMILY AND AMBITIONS OF OPENING MY OWN BUSINESS.

THE FAMILY AND FRIENDS WHO ARE HERE TODAY, THEY CONTINUE TO STAND BY ME AND THEY KNOW THAT I HAVE THE CHARACTER TO KEEP ON GOING AND TO SUCCEED IN THIS LIFE, AND I JUST HOPE THAT YOU SEE THAT, TOO, AND THAT YOU FEEL STRONG AND CONFIDENT THAT I HAVE MORE TO OFFER MY COUNTRY, MY COMMUNITY BY BEING A PRODUCTIVE CITIZEN AGAIN.

AND I HAVE A GOOD HEART. I'M A GOOD PERSON AND I JUST -- I STRAYED OFF THE PATH AND GETTING ARRESTED IS PROBABLY THE MOST FORTUNATE THING TO HAPPEN.

AND I JUST NEED HELP.

THE COURT: AS YOU KNOW FROM THE DISCUSSION THAT WE'VE JUST HAD AND IN THE MATERIALS THAT I'VE REVIEWED YOU CERTAINLY HAVE A FIRST AMENDMENT RIGHT TO SAY -- EXPRESS YOUR

VIEWS, BUT YOU UNDERSTAND THAT SOME OF THE THINGS THAT WERE POSTED BEFORE THIS TRIP THAT INDICATED ON YOUR PART SOME ACCEPTANCE OF SOME REALLY REVOLTING AND HORRIBLE THINGS.

HOW CAN YOU -- AND YOU'VE INDICATED TO ME THAT YOU'VE SEEN YOUR WAYS. HOW CAN I KNOW THAT? WHAT CAN YOU TELL ME TO CAUSE -- TO MAKE SURE THAT I UNDERSTAND THAT YOU'VE LOOKED AT THOSE THINGS AND REALIZED HOW HORRIFIC THEY REALLY ARE AND THAT THEY'RE NOT HUMANITARIAN AND ALL OF THAT? WHAT CAN YOU TELL ME ON THAT?

THE DEFENDANT: JUST EVERYTHING I'VE BEEN READING IN THE NEWSPAPER AND SEEING ON THE NEWS AND THE RECENT EVENTS THAT HAPPENED IN EUROPE AND THE UNITED STATES, IT JUST BECOMES MORE APPARENT THAT THEY'RE NO DIFFERENT THAN AL-QUEDA, BUT THEY TRY TO POSE THEMSELVES DIFFERENT THAN AL-QUEDA BY SAYING THAT, YOU KNOW, WE'RE TRYING TO HELP THE PEOPLE AND WE'RE DOING ALL OF THESE THINGS AND ME BEING NAIVE, THEY TOOK ADVANTAGE OF ME AND MY EMOTIONS AND BASICALLY SAID, WELL, HERE'S THE FOUNDATION FOR YOU TO DO THAT TO HELP AND WE HAVE ALL OF THE RESOURCES THAT YOU NEED AND THEY JUST -- THAT WAS MORE -- IT WAS MORE APPEALING AT THE TIME TO GO AND DO THAT.

THE PROPAGANDA IS REALLY POWERFUL. LIKE, NONE OF, NONE OF THE STUFF THAT WAS COMING OUT OF SYRIA WOULD AFFECT YOU TO TRY TO MAKE YOU DO SOMETHING EXCEPT THAT GROUP, AND THEY WERE THE ONLY GROUP TO BE DOING SOME TYPE OF PROPAGANDA THAT WOULD ACTUALLY MOVE ME TO DO THINGS.

03:35PM AND IT'S WRONG AND THAT'S NOT WHAT I SUPPORT ANYMORE, AND I DON'T KNOW HOW LONG I HAVE TO STAY IN JAIL FOR THE GOVERNMENT OR FOR THE COMMUNITY TO BE COMFORTABLE AND SAYING, OKAY, I THINK HE'S COOL. ALL RIGHT, HE'S NOT RADICALIZED ANYMORE.

THIS IS THE FIRST TIME BEING IN THE CRIMINAL JUSTICE SYSTEM AND JUST GIVE ME A CHANCE TO TRY, JUST TRY ME. THAT'S WHAT I'M ASKING. TRY ME AND SEE HOW I DO AND SEE HOW I PROGRESS.

THE COURT: THANK YOU. YOUR HONOR.

MS. MITCHELL: YOUR HONOR, I WOULD JUST ADD THAT I'VE HAD A LOT OF OPPORTUNITY TO SIT AND MEET WITH MR. NATSHEH, AND I HAVE BEEN PERSONALLY AFFECTED BY THE LOSS OF THE LIFE OF ONE OF MY FRIENDS DIRECTLY FROM ISIL IN A VERY PUBLIC AND HORRIBLE WAY. ONE OF MY FRIENDS WAS ACTUALLY BEHEADED, AND IT WAS IN THE YOUTUBE VIDEO THAT WENT EVERYWHERE.

WHEN I SIT AND I TALK TO MR. NATSHEH, I DON'T FEEL THAT HE IS CAPABLE OF DOING THOSE KINDS OF ACTS. WHEN I SIT AND I TALK TO HIM, I SEE A YOUNG KID WHO HAS BEEN INVOLVED IN A -- FOR A LONG TIME IN TRYING TO DO THINGS HE SEES FOR COMMUNITIES THAT ARE DISADVANTAGED. AND I SEE SOMEONE WHO WAS TRYING TO DO THAT AND IN A VERY WRONG WAY, BUT HE WAS TRYING TO DO THAT.

THE COURT: OF COURSE, THE -- JUST A FACT THAT HE -- MR. NATSHEH HAS TO UNDERSTAND IS THAT THIS NOW IS BIGGER THAN MR. NATSHEH. IT'S ALSO A DETERRENCE ISSUE, AND THERE ARE SADLY OTHERS OUT THERE WHO I HEARD WHAT MR. NATSHEH SAID, AND I

03:37PM APPRECIATE IT, AND I BELIEVE IT'S HEARTFELT, BUT IT ISN'T, UNFORTUNATELY FOR HIM, JUST ABOUT HIM ANYMORE.

SO THE PROCESS HAS TO SEND THE MESSAGE TO OTHERS WHO FIND THEMSELVES LIKE HIM THAT IT'S NOT A LARK, IT'S NOT A FROLIC. YOU DO WHAT WAS DONE HERE BECAUSE FORTUNATELY HE WAS APPREHENDED. THE COURT COULD GO FURTHER. AND HOPEFULLY HE WILL LEAD A PRODUCTIVE LIFE, AND HE WILL HAVE THE OPPORTUNITY TO DO THAT.

BUT THE WORD HAS TO GO OUT TO OTHERS IN THE COMMUNITY THAT WE WON'T SAY, OH, THAT'S OKAY BECAUSE IT'S NOT OKAY. SO IT IS BIGGER THAN JUST THIS DEFENDANT.

ANY LEGAL REASON WHY SENTENCE MAY NOT BE IMPOSED AT THIS TIME?

MS. BECKER: YES, YOUR HONOR.

MS. MITCHELL: NO, YOUR HONOR.

THE COURT: MY TASK, AS YOU KNOW, IS TO APPLY THE FACTORS THAT ARE SET FORTH UNDER 18 U.S.C. SECTION 3553(A), THAT DIRECTS ME TO IMPOSE A SENTENCE THAT IS SUFFICIENT BUT NOT GREATER THAN NECESSARY.

WE'VE HAD A LOT OF DISCUSSION HERE SO I DON'T HAVE TO GO THROUGH ALL OF IT AGAIN, BUT NO DOUBT THIS IS A SERIOUS OFFENSE AND IT IS, HOWEVER ONE MAY WANT TO CHARACTERIZE IT AT THE END OF THE DAY, ATTEMPTING TO PROVIDE AID TO A MURDEROUS TERRORIST ORGANIZATION, AND FORTUNATELY BOTH FOR MR. NATSHEH AND FOR EVERYONE ELSE HE WAS APPREHENDED BEFORE HE COULD JOIN THOSE

EFFORTS. AND WE WON'T REALLY EVER KNOW WHAT MIGHT HAVE TRANSPIRED, BUT WE CERTAINLY COULD HAVE FACED THE PROSPECT IN PARTICULAR BECAUSE OF HIS CITIZENSHIP AND HE COULD HAVE COME BACK TO THE UNITED STATES AT SOME POINT, AT A POINT WHERE THAT COULD HAVE BEEN DANGEROUS.

AT THE SAME TIME, I DO RECOGNIZE THAT MR. NATSHEH IS AND WAS AT THE TIME OF THIS OFFENSE A TROUBLED YOUNG MAN. HE WAS BATTLING DEPRESSION AND ALIENATION, NOT THAT THAT'S AN EXCUSE, BUT MORE IMPORTANTLY, HE DID DO THE BASIC ACTIVITY THAT WARRANTS THE CONVICTION BUT NOT MUCH MORE.

THERE WASN'T ANY TRAINING. THERE WEREN'T ANY WEAPONS INVOLVED. THERE WASN'T ANY PROVIDING FINANCIAL ASSISTANCE. THERE DOESN'T APPEAR TO HAVE BEEN ANY DIRECT EFFORT TO RECRUIT OTHERS. THE CONDUCT REALLY WAS RESTRICTED TO STARTING THE PROCESS OF JOINING UP WITH A TERRORIST ORGANIZATION.

THE TERRORIST ENHANCEMENT AND THE STATUTORY MAXIMUM, I THINK, ARE INTENDED FOR VERY DIFFERENT CASES THAN WE HAVE HERE. I MEAN, IT'S AN IMPORTANT STATUTE DIRECTED TO IMPORTANT ACTIVITY THAT IS VERY DANGEROUS TO THE UNITED STATES, BUT THIS CASE IS REALLY MUCH MORE SIMILAR ALONG THE LINES OF THE CASES THAT HAVE INVOLVED REALLY ONE END OF THE SPECTRUM OF ACTUAL CONDUCT.

SO THOSE ARE THE CASES THAT I'M LOOKING TO, AND I THINK THE RANGE OF THOSE CASES, AS I LOOKED AT THE COMPARABLES THAT WERE PROVIDED TO ME, AND I KNOW MS. MITCHELL SAID THAT THERE

WAS A RECENT PROBATIONARY SENTENCE, BUT IT APPEARED THAT MOST OF THE SENTENCES WERE IN MOST OF THE 36- TO 84-MONTH RANGE, AND I THINK SOMEWHERE IN THAT RANGE IS THE APPROPRIATE PLACE TO SET THIS.

SO I THINK -- AND I THINK A LONG TERM OF SUPERVISED RELEASE IS IMPORTANT, AND WE HAD THAT DISCUSSION ABOUT PROGRAMS THAT MAY ACTUALLY DIRECTLY GO TO SOME OF THESE CONCERNS. I'M NOT SUGGESTING THAT MR. NATSHEH IS NOT BEING ENTIRELY SINCERE. HE'S SEEN, AS HE SAID, THE ERRORS OF HIS WAY, AND HE'S NOT GOING THE RADICAL ROUTE, BUT I STILL WISH WE HAD BETTER PROGRAMS THAT WOULD ASSIST IN THAT DIRECTION.

SO I THINK IT IS A SIGNIFICANT SENTENCE TO IMPOSE A 60-MONTH SENTENCE. THAT'S A LONG TIME. AND I THINK FOR SOMEONE IN MR. NATSHEH'S POSITION, HE WOULD PROBABLY VIEW THAT AS A VERY LONG TIME. BUT I THINK IT DOES SEND THE MESSAGE TO THE COMMUNITY THAT THERE'S A COST ASSOCIATED WITH ENGAGING IN THIS ACTIVITY WHICH IN A DIFFERENT CONTEXT COULD HAVE BEEN EXTRAORDINARILY DANGEROUS AND SERIOUS. FORTUNATELY HERE IT WAS STOPPED BEFORE IT GOT TO THAT POINT.

SO I THINK A 60-MONTH SENTENCE FOLLOWED BY A LONG PERIOD OF SUPERVISED RELEASE WHERE HOPEFULLY AT THE POINT WHERE MR. NATSHEH IS BACK INTO THE COMMUNITY, HE COULD ACTUALLY GET ASSISTANCE FROM THE PROBATION AUTHORITIES IN TERMS OF GETTING BACK ON HIS FEET AND MOVING FORWARD WITH HIS LIFE, AND HE MAY NOT VIEW IT THIS WAY, BUT HE STILL WILL BE A YOUNG MAN WHEN

03:41PM HE'S -- HE WILL BE IN HIS TWENTIES AND WHEN HE IS BACK IN THE COMMUNITY.

SO PURSUANT TO THE SENTENCING REFORM ACT OF THE 1984 IT IS THE JUDGMENT OF THE COURT THAT ISLAM NATSHEH IS HEREBY COMMITTED TO THE CUSTODY OF THE BUREAU OF PRISONS TO BE IMPRISONED FOR A TERM OF 60 MONTHS. AND THAT OBVIOUSLY, SO IT'S CLEAR, IT REPRESENTS A VARIANCE OF THE STATUTORY MAXIMUM. THE COURT RECOMMENDS THAT THE DEFENDANT PARTICIPATE IN THE BUREAU OF PRISONS RESIDENTIAL DRUG TREATMENT PROGRAM.

AND THAT RECOMMENDATION, I TAKE IT, WAS BASED ON THE USE OF CONTROLLED SUBSTANCES?

PROBATION OFFICER: HE HAD A SIGNIFICANT MARIJUANA ADDICTION AT THE TIME.

THE COURT: ALL RIGHT. UPON RELEASE FROM IMPRISONMENT, THE DEFENDANT SHALL BE PLACED ON SUPERVISED RELEASE FOR A PERIOD OF SIX YEARS.

WITHIN 72 HOURS OF RELEASE FROM CUSTODY FROM THE BUREAU OF PRISONS, THE DEFENDANT SHALL REPORT IN PERSON TO THE PROBATION OFFICE IN THE DISTRICT TO WHICH THE DEFENDANT IS RELEASED.

WHILE ON SUPERVISED RELEASE, THE DEFENDANT SHALL NOT COMMIT ANOTHER FEDERAL, STATE OR LOCAL OR CRIME, SHALL COMPLY WITH THE STANDARD CONDITIONS THAT HAVE BEEN ADOPTED BY THIS COURT, AND SHALL REFRAIN FROM ANY UNLAWFUL USE OF THE CONTROLLED SUBSTANCE AND SUBMIT TO THE DRUG TEST WITHIN 15 DAYS OF RELEASE ON SUPERVISED RELEASE AND TWO PERIODIC DRUG TESTS

03:43PM THEREAFTER AND SHALL COMPLY WITH THE FOLLOWING CONDITIONS.

1. THE DEFENDANT SHALL PARTICIPATE IN A PROGRAM OF TESTING AND TREATMENT FOR DRUG ABUSE AS DIRECTED BY THE PROBATION OFFICER UNTIL SUCH TIME THAT THE DEFENDANT IS RELEASED FROM TREATMENT BY THE PROBATION OFFICER.

THE DEFENDANT IS TO PAY PART OR ALL OF THE COST OF THE TREATMENT IN AN AMOUNT NOT TO EXCEED THE COST OF TREATMENT AS DEEMED APPROPRIATE BY THE PROBATION OFFICER. PAYMENTS SHALL NEVER EXCEED THE TOTAL COST OF URINALYSIS AND COUNSELLING. THE ACTUAL COPAYMENT SHALL BE DETERMINED BY THE PROBATION OFFICER.

2. THE DEFENDANT SHALL PARTICIPATE IN A MENTAL HEALTH TREATMENT PROGRAM AS DIRECTED BY THE PROBATION OFFICER. THE DEFENDANT IS TO PAY PART OR ALL OF THE COST OF THIS TREATMENT AT AN AMOUNT NOT TO EXCEED THE COST OF TREATMENT AS DEEMED APPROPRIATE BY THE PROBATION OFFICER. PAYMENTS SHALL NEVER EXCEED THE TOTAL COST OF MENTAL HEALTH COUNSELLING. THE ACTUAL COPAYMENT SCHEDULE SHALL BE DETERMINED BY THE COUNSELLOR.

3. THE DEFENDANT -- AS DIRECTED BY THE PROBATION OFFICER, THE DEFENDANT SHALL ENROLL IN THE PROBATION OFFICER'S COMPUTER AND INTERNET MONITORING PROGRAM (CIMP) AND SHALL ABIDE BY THE REQUIREMENTS OF THE CIMP PROGRAM AND THE ACCEPTABLE USE CONTRACT.

4. THE DEFENDANT SHALL CONSENT TO THE PROBATION OFFICER CONDUCTING A PERIODIC UNANNOUNCED EXAMINATION OF HIS

COMPUTER EQUIPMENT. I NOTE, BY THE WAY, THERE WERE SOME OBJECTIONS BY THE DEFENSE TO CERTAIN OF THESE CONDITIONS, ONE WITH RESPECT TO FINANCIAL INFORMATION AND THE LIKE.

I'VE READ THE REPLY THAT THE GOVERNMENT PROVIDED. I THINK THE GOVERNMENT HAS CONVINCED ME THAT THESE ARE APPROPRIATE CONDITIONS SO I WILL OVERRULE THOSE OBJECTIONS.

SO GOING BACK TO NUMBER 4. THE DEFENDANT SHALL CONSENT TO THE PROBATION OFFICER CONDUCTING PERIODIC UNANNOUNCED EXAMINATIONS OF HIS COMPUTER EQUIPMENT WHICH MAY INCLUDE RETRIEVAL AND COPYING OF ALL DATA FROM HIS COMPUTERS AND ANY PERIPHERAL DEVICE TO ENSURE COMPLIANCE WITH THIS CONDITION, AND/OR REMOVAL OF ANY SUCH EQUIPMENT FOR THE PURPOSE OF CONDUCTING MORE THOROUGH INSPECTION. THE DEFENDANT SHALL ALSO CONSENT TO THE INSTALLATION OF THE HARDWARE AND SOFTWARE AS DIRECTED BY THE PROBATION OFFICER TO MONITOR THE DEFENDANT'S INTERNET USE.

5. THE DEFENDANT SHALL PAY ANY SPECIAL ASSESSMENT THAT IS IMPOSED BY THIS JUDGMENT AND THAT REMAINS UNPAID AT THE COMMENCEMENT OF THE TERM OF SUPERVISED RELEASE.

6. THE DEFENDANT SHALL PROVIDE THE PROBATION OFFICER WITH ACCESS TO ANY FINANCIAL INFORMATION, INCLUDING TAX RETURNS, AND SHALL AUTHORIZE THE PROBATION OFFICER TO CONDUCT CREDIT CHECKS AND OBTAIN COPIES OF THE CREDIT RETURNS.

THE DEFENDANT SHALL AT ALL TIMES EITHER HAVE FULL-TIME EMPLOYMENT, FULL-TIME TRAINING FOR EMPLOYMENT, FULL-TIME JOB

SEARCH, ENROLLED IN COLLEGE OR SOME COMBINATION THEREOF UNLESS OTHERWISE EXCUSED BY THE PROBATION OFFICER.

8. THE DEFENDANT SHALL SUBMIT HIS PERSON, RESIDENCE, OFFICE, VEHICLE OR ANY PROPERTY UNDER HIS CONTROL TO A SEARCH. SUCH A SEARCH WILL BE CONDUCTED BY A UNITED STATES PROBATION OFFICER AT A REASONABLE TIME AND IN A REASONABLE MANNER BASED UPON A REASONABLE SUSPICION OF CONTRABAND OR EVIDENCE OF A VIOLATION OF A CONDITION OF RELEASE. FAILURE TO SUBMIT TO SUCH A SEARCH WILL BE GROUNDS FOR REVOCATION. THE DEFENDANT SHALL WARN ANY RESIDENTS THAT THE PREMISES MAY BE SUBJECT TO SEARCHES.

9. THE DEFENDANT SHALL NOT ASSOCIATE WITH ANY MEMBER OF THE ISLAMIC STATE OF IRAQ, AL SHAM, ISIS, THE ISLAMIC STATE OF IRAQ AND SYRIA -- I'M NOT SURE I CAN PRONOUNCE THIS -- AD-DAWLA AL-ISLAMIYYA F AL-'IRAQ WA-SH-SHAM, DAESH, DAWLA AL ISLAMIYA, AND AL-FURQUAN ESTABLISHMENT FOR MEDIA PRODUCTION.

THE DEFENDANT SHALL HAVE NO CONNECTION WHATSOEVER WITH THESE TERRORIST GROUPS OR ANY OTHER TERRORIST GROUP OR GANG.

IF HE IS FOUND TO BE IN THE COMPANY OF SUCH INDIVIDUALS OR WEARING THE CLOTHING, COLORS OR INSIGNIA -- I KNOW THE DEFENDANTS POINTED OUT THEY DON'T HAVE A GANG COLOR AND THE LIKE AND THAT'S A REASONABLE POINT, BUT TO THE EXTENT THAT THERE IS ANY KIND OF LOGO OR INDICIA OF THE ABOVE NOTED TERRORIST GROUPS SHOULD THEY DEVELOP SUCH, THE COURT WILL PRESUME THAT THE ASSOCIATION WAS FOR THE PURPOSE OF

03:46PM PARTICIPATING IN THE ACTIVITY OF THOSE GROUPS.

03:46PM 10. THE DEFENDANT SHALL COOPERATE IN THE COLLECTION OF DNA AS DIRECTED BY THE PROBATION OFFICER.

03:47PM 11. THE DEFENDANT SHALL NOT OWN OR POSSESS ANY FIREARMS, AMMUNITION, DESTRUCTIVE DEVICES OR OTHER DANGEROUS WEAPONS.

03:47PM IT IS FURTHER ORDERED THAT THE DEFENDANT SHALL PAY TO THE UNITED STATES A SPECIAL ASSESSMENT OF $100 AND PAYMENT SHALL BE MADE TO THE CLERK OF THE U.S. DISTRICT COURT, 450 GOLDEN GATE AVENUE, BOX 36060, SAN FRANCISCO, CA 94102.

03:47PM DURING IMPRISONMENT, PAYMENT OF CRIMINAL MONETARY PENALTIES ARE DUE AT A RATE NOT LESS THAN $25 PER QUARTER AND PAYMENT SHALL BE THROUGH THE BUREAU OF PRISONS INMATE FINANCIAL RESPONSIBILITY PROGRAM.

03:47PM THE COURT FINDS THE DEFENDANT DOES NOT HAVE THE ABILITY TO PAY A FINE AND ORDERS THAT THE FINE BE WAIVED.

03:47PM MS. MITCHELL, DO YOU HAVE ANY REQUESTS IN TERMS OF DESIGNATION OR --

03:47PM MS. MITCHELL: WE WOULD REQUEST CALIFORNIA, IF POSSIBLE, A FACILITY IN CALIFORNIA, IF POSSIBLE.

03:47PM FCI MENDOTA WOULD BE THE ONE THAT IS CLOSEST TO HIS FAMILY HERE.

03:47PM THE COURT: AND DO YOU WANT THAT SPECIFIC ONE?

03:47PM MS. MITCHELL: YES, YOUR HONOR.

03:47PM THE COURT: ALL RIGHT. I'LL MAKE THAT

RECOMMENDATION AND IF NOT THAT FACILITY, A CALIFORNIA FACILITY.

AND, AGAIN, TO THE EXTENT THAT THERE IS ANY PROGRAMS, CERTAINLY ONES AT THE SUPERVISED RELEASE PHASE, I ENCOURAGE THE PROBATION OFFICER TO EXPLORE THAT AS YOU SET FORTH AS YOU INDICATED YOU WOULD AND NOT JUST FOR MR. NATSHEH BUT IN GENERAL.

MR. NATSHEH, YOU HAVE A RIGHT TO APPEAL. YOUR SENTENCE YOU ENTERED INTO IS WHAT IS CALLED AN OPEN PLEA AND SO YOU DO HAVE A RIGHT TO APPEAL.

IN THE EVENT THAT YOU ELECT TO APPEAL, YOU WOULD NEED TO DO THAT WITHIN 14 DAYS OF THE ENTRANCE OF THIS JUDGMENT.

DO YOU UNDERSTAND THAT?

THE DEFENDANT: YES, SIR.

THE COURT: OKAY. ANYTHING FURTHER?

MS. BECKER: NO, YOUR HONOR.

MS. MITCHELL: NO, YOUR HONOR.

MS. BECKER: THANK YOU. THANK YOU.

(COURT CONCLUDED AT 3:49 P.M.)

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

Irene Rodriguez

IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074

DATED: JULY 13, 2017