

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AAS:DMP
F. #2014R01413

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 25, 2017

<u>By ECF</u>

Honorable William F. Kuntz
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:    United States v. Abdurasul Hasanovich Juraboev
>          Criminal Docket No. 15-95 (WFK)

Dear Judge Kuntz:

The government respectfully submits this letter regarding sentencing of the above-referenced defendant, currently scheduled for Friday, October 27, 2017 at 1 p.m. For the reasons articulated below, the government believes that a Guidelines sentence of 15 years' imprisonment, which is the statutory maximum sentence for the offense of conviction, is appropriate in this case.

I.      <u>Background</u>

A.  <u>Islamic State of Iraq and al-Sham ("ISIS")</u>

ISIS is a foreign terrorist organization that, since 2013, has claimed credit for numerous terrorist activities, including seizing Mosul, a city in northern Iraq, launching rocket attacks on eastern Lebanon in March 2014, the November 2015 terrorist attacks in Paris, France, and the March 2016 suicide bombings in Brussels, Belgium, among many others. These terrorist activities are part of ISIS's broader goal of forming an Islamic state or "caliphate"[1] in Iraq and Syria.

---

[1]      "Caliphate" is a term that is used to refer to ISIS's self-proclaimed system of religious governance, with Abu Bakr al-Baghdadi as the caliphate's self-proclaimed leader.

On or about October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq (AQI), then known as Jam 'at al Tawid wa' al-Jahid, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224.  On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant (ISIL) as its primary name. The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS" – which is how the FTO will be referenced herein), The Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS.  To date, ISIS remains a designated FTO.  (Presentence Investigation Report ("PSR") ¶¶ 3-6).

B.  The Investigation

Beginning in 2014, the government began to investigate a group of individuals based in Brooklyn who either planned to travel to Syria to join ISIS or to finance the travel of other individuals to Syria to join ISIS.

The defendant, a permanent resident of the United States and citizen of Uzbekistan, first came to the attention of the government with his online postings on an Uzbek-language social media website, Hilofatnews.com ("Hilofatnews").  Hilofatnews was, until approximately August 15, 2014, an Uzbek-language website that propagated ISIS's ideology and called for its Uzbek-speaking audience to join ISIS.  The website contained videos, pictures and articles of ISIS military operations in Iraq and Syria, as well as Koran recitations, video sermons about the "global caliphate," and calls to join jihad within the ranks of ISIS.

On August 8, 2014, the defendant posted the following message to Hilofatnews:

> Greetings! We too wanted to pledge our allegiance and commit ourselves
> while not present there. I am in USA now but we don't have any arms. But is
> it possible to commit ourselves as dedicated martyrs anyway while here?
> What I'm saying is, to shoot Obama and then get shot ourselves, will it do?
> That will strike fear in the hearts of infidels.

In other words, the defendant was inquiring as to whether he could swear an oath of allegiance to ISIS in absentia, meaning from the United States.  The defendant further inquired as to whether, since he was located in the United States, it would be possible for him to engage in an act of martyrdom on U.S. soil, such as killing then-President Obama,

2

because such an act would strike fear in the hearts of the "infidels," meaning Americans. (PSR ¶ 7).

On August 15, 2014, agents visited the defendant at his Brooklyn residence. In sum and substance, the defendant acknowledged that he wrote and posted the above-referenced message on Hilofatnews, which he characterized as the Uzbek-language site of ISIS. The defendant also stated his belief in ISIS's terrorist agenda, including the establishment by force of an Islamic caliphate in Iraq and Syria. The defendant further stated that he would like to travel to Syria to engage in violence on behalf of ISIS "if Allah wills," but currently lacked the means to travel there. In addition, the defendant stated that he would harm then-President Obama if he had the opportunity to do so, but at the time did not have the means or an imminent plan to do so.

On or about August 18, 2014, law enforcement agents met again with the defendant at his residence in Brooklyn. While admitting that he did not like President Obama because of his role in killing Muslims through his support of Israel and the bombing of ISIS, the defendant stated that he would not kill President Obama because of ill will towards him, but rather because of "Allah." When asked to clarify the nature of his posting, the defendant stated that he wanted to communicate his approval of the actions of ISIS and establish contact with ISIS. He added that, if ISIS ordered him to kill President Obama, he would do so. He further stated that any order to kill the President could come from anyone within ISIS—not necessarily only from ISIS leader Abu Bakr al-Baghdadi—provided that the order had a basis in the Koran and the Sunnah (the traditions of the Prophet Muhammad). The defendant noted that if he received an affirmative or positive response from ISIS to the above-referenced posting on Hilofatnews, he would kill President Obama. The defendant added that he would also plant a bomb on Coney Island if he were so ordered by ISIS.

During the interview, the defendant made the following written statement:

Islamic right is fighting under caliphate against polytheists and infidels.

I also want to fight and sincerely become a martyr under the Islamic Caliphate against the polytheists and infidels.

If I get a command from the Islamic Caliphate that is according to Quran and Sunnah if I gave pledge to Islamic State and I have the means to carry out the given command and if I can make my intention only for Allah or not because I don't like it only if it's for Allah I will carry out. !

Even if that person is Obama. !

What Allah desires will happen.

3

In this statement, the defendant reiterated his allegiance to ISIS ("I also want to fight and sincerely become a martyr under the Islamic Caliphate against the polytheists and infidels; I gave pledge to Islamic State") and his intention of killing President Obama ("Even if that person is Obama. !") if commanded to do so by ISIS ("If I get a command from the Islamic Caliphate").  (PSR ¶ 7).

During the interview, the defendant identified his associate Akhror Saidakhmetov as a friend and coworker who shared the defendant's views on ISIS and who had discussed with the defendant his wish to wage jihad by fighting in Syria or by engaging in violence in the United States.

Subsequent court-authorized interceptions of electronic communications between the defendant and purported ISIS representatives revealed the defendant and Saidakhmetov's commitment to traveling to Syria to join ISIS.  On August 26, 2014, the defendant engaged in a communication with an individual who identified himself as "Abu Bakr Bagdodi Halifat Dovlati Islamiya" ("Bagdodi"), who, according to open source records, is the Iraq-based "Administrator" of the website "Islamic State News," which disseminated ISIS news and propaganda.  Abu Bakr al-Baghdadi is the name of the leader of ISIS, and "Halifat Dovlati Islamiya" means Islamic Caliphate State in Uzbek.  The defendant's intercepted communication with Bagdodi on August 26, 2014, was as follows:

Bagdodi:     Even the Caliph himself is doing Jihad.  How come you are not coming here?  Or is it not Jihad for you?  Or the oppression of Muslims by infidels is not enough for you?  Or you want to wait till they enter your house?

Bagdodi:     When was this Hadith told?  It falls in the times when it was considered Fard Kifaya.  Nowadays this Hadith means Fard Ayn.  God willing, it is Fard Ayn for every Muslim.  Do you think this Hadith is sufficient for you?

Defendant:   Can you provide me Fatwa to my circumstances?  First, I am in the land of infidels.  If right now I decide to go to the airport and go anywhere, except for Uzbekistan, they may arrest me.  It's because of what I told them about Obama.  "If I contact with someone from the Caliphate, pledge oath, and then if they order me to kill Obama if the order is based on the Quran and Sunnah, if I have what I need, i.e. guns, then for Allah and my intentions, and because he is an enemy of Allah, I will execute Obama," I said.  Even after these words, they left me alone.  Why?  Because they think I am establishing a Jihadi group, or I belong to such group, Allah knows the best.  My parents in Uzbekistan, sometimes they worship and practice Islam, sometimes they do

4

idolatry. My sisters are uncovered, lack knowledge of a religion. I wish they knew at least how to cover themselves up. What should I do? I need to sneak out of here with extreme caution without being noticed by them.

In this communication, Bagdodi encouraged the defendant to travel to territories controlled by ISIS ("how come you are not coming here?") to wage jihad, and explained that traveling was "Fard Ayn," meaning that it was mandatory on all Muslims. The defendant responded with a request for a fatwa, or a religious edict, from Bagdodi given the defendant's concern that he would be arrested if he tried to travel outside of the United States based on his threat against President Obama. The defendant then stated that he was trying to leave the United States ("sneak out of here") without being noticed by the FBI ("with extreme caution without being noticed by them"). In addition, in this communication, the defendant acknowledged his interviews with the FBI and his admissions during those interviews of his willingness to kill President Obama if so ordered by ISIS. (PSR ¶¶ 9, 10).

Similarly, in an intercepted communication on or about October 3, 2014, the defendant asked Bagdodi, "Brother, is it difficult to pass from Turkey to Syria?" Bagdodi responded, "Today brothers told me that it got a bit difficult to cross." Notably, in 2014 and 2015, many travelers seeking to join ISIS in Syria did so by crossing the border between Turkey and Syria on foot. (PSR ¶ 11).

Recorded communications between the defendant and Saidakhmetov further confirmed their planned coordinated travel to Syria. For example, on September 14, 2014, the defendant advised Saidakhmetov to discuss travel itineraries with his contact on Hilofatnews, saying that the "Turkish border is heavily guarded right now, especially at Dawla side. If one doesn't know a route, he may get caught. Secondly, once you cross the border of the Islamic state, someone has to receive you there. There is a border there as well. The people who receive you . . . They will say, "this man belongs to us," and they will take you in." (PSR ¶ 11).

Similarly, on December 9, 2014, Saidakhmetov and the defendant spoke in a recorded conversation. Saidakhmetov asked the defendant to "delete" Saidakhmetov's profile on "odnoklassniki," which is a Russian-based social networking site. According to Saidakhmetov, the "Americans" were able to "find out who you were from your posts in Uzbek on that site belonging to Uzbeks called [Hilofatnews, and] they can trace odnoklassniki too." Saidakhmetov was referring to the fact that the FBI traced the posting in which the defendant offered to kill President Obama to the defendant and that Saidakhmetov had posted similar violent jihadist material on odnoklassniki. The defendant promised to try to delete Saidakhmetov's profile. During the same conversation, Saidakhmetov asked the defendant whether the defendant was planning to buy a ticket to Russia or whether he would travel straight to Turkey. In response, the defendant instructed Saidakhmetov not to discuss such matters on the phone. In a recorded telephone conversation the next day, the defendant

5

confirmed to Saidakhmetov that the defendant had deleted Saidakhmetov's profile on odnoklassniki.  Agents from the FBI then attempted to visit Saidakhmetov's page on odnoklassniki and found that his profile had, in fact, been deleted.

In or about late September 2014, a confidential informant (the "CI") approached the defendant at a mosque, while posing as an ideologically sympathetic individual, and met Saidakhmetov later the same day.  During the course of their relationship, the defendant and Saidakhmetov introduced the notion that the Cl should also travel to Syria to join ISIS.  In numerous recorded conversations, the defendant confirmed his plan to travel to Syria to join ISIS in or about March 2015.  (PSR ¶ 14).

In fact, a query of airline reservation record databases revealed that, on December 27, 2014, the defendant purchased a round-trip ticket to travel from John F. Kennedy International Airport in Queens, New York, to Istanbul, Turkey, departing on March 29, 2015 and returning on May 28, 2015.  In a recorded conversation on or about December 29, 2014 and in at least one other conversation, the defendant informed the CI that he had purchased a round-trip ticket to Istanbul for $598, noting that the round-trip ticket cost less than a one-way ticket. . The defendant told the CI that if the defendant were questioned when leaving for Turkey, he would state that he was traveling to Uzbekistan and would show his return ticket.  (PSR ¶ 16).

On January 21, 2015, in a recorded conversation with the CI, the defendant stated that, upon arrival in Syria, he would probably obtain a Kalashnikov automatic weapon, as there was no shortage of weapons in the Islamic State.

Early in the morning on February 25, 2015, agents arrested Saidakhmetov at JFK Airport as he attempted to board a flight with a final destination of Istanbul, Turkey. Agents arrested the defendant at his home in Brooklyn on the same day.  (PSR ¶ 22).

On March 9, 2015, a grand jury in the Eastern District of New York returned an indictment charging the defendant, Saidakhmetov, and a member of the financial support network that provided financial assistance to Saidakhmetov, Abror Habibov.  The defendant was charged with conspiring and attempting to provide material support to ISIS, in violation of 18 U.S.C. § 2339B.

On August 14, 2015, the defendant pleaded guilty before Your Honor to one count of conspiracy to provide material support to ISIS, in violation of 18 U.S.C. § 2339B. (PSR ¶ 1).

Notably, on or about December 4, 2015, while in custody, the defendant wrote a letter to the Court in which he demanded justice and a fair decision on sentencing; stated that if the Court could not make a fair decision on his sentencing, Allah would hold the Court responsible on Judgment Day; and that the Court would burn in Hell if he made the wrong

6

decision. A copy of the original letter is attached; the government will provide a translated version to the Court prior to the time of sentencing.

On January 11, 2016, the Probation Department disclosed the PSR. The PSR calculates an effective Guidelines sentence of 180 months' imprisonment, which is the statutory maximum for the count of conviction. The government concurs with this calculation.

II.    Applying the Section 3553(a) Factors

In addition to the range recommended by the Guidelines, 18 U.S.C. § 3553(a) requires the Court to consider a number of factors in imposing sentence, including (among others) the nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1)); the need for the sentence to reflect the seriousness of the violation, to promote respect for the law, and to provide a just punishment for the violation (§ 3553(a)(2)(A)); and the need for the sentence to afford adequate deterrence to criminal conduct (§ 3553(a)(2)(B)), and to protect the public from further crimes or violations of the defendant (§ 3553(a)(2)(C)).

In this case, the sentence imposed must reflect the seriousness of the defendant's conduct, deter the defendant specifically from committing further crimes, deter others from traveling to join ISIS, and promote respect for the law. These factors all counsel in favor of a Guidelines sentence.

The conduct is undeniably serious. The defendant agreed with Saidakhmetov and others to travel to Syria to join ISIS and wage violent jihad. The defendant made online postings in which he communicated his approval of the actions of ISIS, and sought to establish contact with ISIS. He then discussed with others online his desire to travel to Syria to join ISIS, and specifically how he would get to Syria. The defendant purchased a ticket to Turkey, from which he intended to go to Syria and join ISIS. The defendant stated his intention, once he arrived in Syria, of obtaining an AK-47. All of these actions demonstrate the defendant's intent to join a foreign terrorist organization and to wage jihad on behalf of the foreign terrorist organization. Notably, the defendant also engaged in obstructive conduct when he deleted his co-conspirator Saidakhmetov's profile on odnoklassniki so that the FBI could not find that profile.

In his sentencing submission, the defendant argues that the Court should not consider his statements regarding his intent to kill President Obama or to detonate a bomb on Coney Island because those statements are protected speech. The government does not disagree that these statements are protected speech; in fact, the government did not arrest the defendant in August 2014 when he made those statements, but rather in February 2015 after he had conspired with others to travel to Syria to join ISIS and purchased a plane ticket to see that plan through. Nevertheless, the statements are relevant to the defendant's intent – specifically, he stated that he would take these or other violent actions on behalf of ISIS if

7

directed to do so by ISIS. These statements are therefore probative evidence of the defendant's intent to act in accordance with ISIS's directions and in concert with ISIS, even if that meant committing a terrorist act on American soil.[2]

Moreover, the sentence should deter the defendant from committing future crimes, as well as deter others contemplating similar criminal conduct of joining a foreign terrorist organization to wage violent jihad. Given the defendant's sustained efforts to travel to Syria where he would engage in violent jihad, the Court must also give serious consideration to the need to protect the public from further crimes of the defendant (§ 3553(a)(2)(C)). The government respectfully submits that this factor, when considered together with the seriousness of the defendant's conduct, requires imposition of a Guidelines sentence.

The Guidelines themselves show that a sentence of 180 months' imprisonment is appropriate for deterrence purposes, by enhancing the defendant's criminal history category by 12 levels for a crime of terrorism and by placing the defendant in Criminal History Category VI. As the Second Circuit has explained, "Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003). The Court continued, "even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." Id.

The defendant's arguments in favor of a lesser sentence should be rejected. In his sentencing memorandum, the defendant advocates a sentence of five years or less, largely in light of two sentences imposed in other jurisdictions for individuals who, like the defendant, attempted to travel overseas to join a designated foreign terrorist organization.

The first sentence relied upon by the defense, in United States v. Natsheh, 16 Cr. 166 (RS) (N.D. Ca.), concerned a defendant who attempted to travel to Istanbul, Turkey, in order to pass into Syria to join ISIS. At sentencing, the district judge in Natsheh credited the defendant's cooperation with law enforcement – which consisted of speaking candidly with law enforcement about his plans and consenting to a search of his phone – and cited the "restricted" nature of the defendant's conduct in refusing to apply the terrorism sentencing enhancement and imposing a sentence of five years' incarceration and six years' supervised

---

[2]       The defense also suggests that the CI entrapped the defendant into committing the offense of conviction. Not only does all available evidence suggest that the defendant was preparing to join ISIS before he ever met the CI, but also the defense cannot point to any recorded communications in which the CI coerced or persuaded the defendant into committing criminal conduct.

release.  (Id. Docket Entry 26 at 31).  Notably, the defendant here stipulated to the application of the terrorism enhancement.

The second sentence, in United States v. Conley, 14 Cr. 163 (D. Colo.), involved a defendant apprehended while attempting to travel to Syria via Turkey to join ISIS. Though the district judge in Conley imposed a sentence of four years' incarceration, the government itself advocated a sentence of four years' imprisonment, in light of the defendant's cooperation.  (Id. Docket Entry 81 at 8, 33).  Notably, the defendant had pleaded guilty to a violation of 18 U.S.C. § 371, which carries a statutory maximum of five years.

Neither Natsheh nor Conley are particularly relevant to the instant case. Rather, recent sentences imposed within this district, as well as within the Second Circuit, for individuals who attempt to travel overseas to join a foreign terrorist organization militate against imposition of the lenient sentence requested by the defense.  See, e.g., United States v. Tairod Pugh, 15-CR-116 (E.D.N.Y.) (420 months); United States v. Justin Kaliebe, 13-CR-72 (E.D.N.Y.) (156 months); United States v. Agron Hasbajrami, 11-CR-623 (E.D.N.Y.) (192 months); United States v. Abdel Hameed Shehadeh, 10-CR-1020 (E.D.N.Y.) (13 years); United States v. Ming Quang Pham, 12-CR-423 (S.D.N.Y.) (480 months).

Rather than speculating about why another court sentenced a particular defendant the way it did, the government respectfully submits that, as set forth above, the Court should use the defendant's advisory Guidelines sentence as the "starting point and the initial benchmark," Gall v. United States, 552 U.S. 38, 49 (2007), consider all of the § 3553(a) factors applicable to the defendant, and then "make an individualized assessment based on the facts presented."  Id. at 50 (citation and footnote omitted).

A sentence of 180 months' imprisonment is consistent with other cases in this district.  As noted above, courts in this district (and around the country) have correctly severely sanctioned similarly situated individuals who, like the defendant, seek to travel to foreign lands to join terrorist organizations.  Contrary to assertions by the defense, such crimes are extraordinarily grave, in light of acts of wanton destruction perpetrated by such organizations through the hands of foreign fighters – the role aspired to by the defendant.

For all these reasons, the government respectfully requests that the Court should sentence the defendant to a Guidelines sentence of 180 months' imprisonment in order to provide just punishment, promote respect for the law, and provide adequate deterrence to others contemplating similar acts.

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney

By:    /s/ Alexander A. Solomon
Alexander A. Solomon
Douglas M. Pravda
Peter Baldwin
David Kessler
Assistant U.S. Attorneys
(718) 254-7000

cc:    Defense counsel for defendant Juraboev (by ECF)
Clerk of the Court (WFK) (by ECF)